GARRETT *v.* MRS. REVA S. HART, et al.

No. 43081 November 9, 1964 168 So. 2d 497

*Coleman & Dobbs,* Ackerman, for appellant and cross-appellee.

*Lott & Sanders,* Greenwood, for appellees and cross-appellants.

McElroy, J.

This is an appeal by William Garrett, complainant below, from a decree of the Chancery Court of Montgomery County, Mississippi. Appellees and cross-appellants are Mrs. Reva S. Hart and others.

In his bill of complaint against Mrs. Reva S. Hart and Jiles Edwards personally, and against Mrs. Hart and her brother Bernard Schneider as executors of the estate of their father, Joseph Schneider, deceased, and Rupert Ringold, trustee in deeds of trust, William Garrett, a building contractor, alleged the following. On October 31, 1959 he entered into a written contract with Mrs. Hart and her father, Joseph Schneider, then living, for the construction of six three-bedroom houses, the consideration being certain lands and a quantity of cottonseed hulls. The land was deeded to him by Schneider on October 31, 1959 and placed in escrow until Garrett

should deliver a performance bond for $30,000 to guarantee proper compliance with the building contract. On November 14, 1959 Garrett executed to Mrs. Hart and Mr. Schneider a deed of trust on the land in lieu of the performance bond, and the deed was delivered to him from escrow. On the same date Schneider conveyed to appellant personal property as consideration for construction of a seventh house like the other six, with certain changes as set out. The six houses were to be constructed on land belonging to Mrs. Hart; the seventh was to be built upon either her land or other land as directed by Schneider. Garrett executed to Schneider a chattel deed of trust on the personal property as a guaranty of faithful performance in constructing the seventh house.

The complaint alleged further that on February 23, 1960 Garrett and Schneider made a supplementary written agreement whereby certain changes and additions in the construction of all the houses were to be made for an additional cost of $1,000 per house, or a total of $7,000. Mrs. Hart was not a party to the execution of this instrument.

The complaint alleged there was an oral agreement between Garrett and Schneider at a later date whereby Garrett was to make certain changes in the seventh house for an additional sum of $3,500.

The complaint showed that Mr. Schneider died on April 3, 1960, and that Mrs. Reva S. Hart and Mr. Bernard Schneider are the executors of his estate.

The complaint showed Garrett had been paid $7,000 for the work specified in the agreement of February 23, 1960, but that he had not been paid for certain items in the addendum to the agreement. It acknowledged he was paid $3,500 under the oral agreement, and he received advancements of $9,500 for labor and material, secured by deeds of trust, but claimed an additional $2,549.80 is due.

The complaint contended Jiles Edwards, as agent for Schneider, carried away at various times certain lights, kitchen and bathroom fixtures, and other personal property valued at $979.30, for which complainant is entitled to a credit.

The complaint showed Garrett on September 8, 1960 had reasonably complied with the terms of the contract, and had delivered all keys to Mr. Ringold and requested a settlement with Mrs. Hart and a cancellation of the deeds of trust. His offer was rejected and he asked for limitation of interest on his indebtedness.

Finally, the bill of complaint set out that Garrett owed advancements of $9,500 plus accrued interest of $267.50, or a total of $9,767.50; that he was entitled to credit for additional materials in the amount of $2,549.80, and a credit of $979.30 for property removed by Edwards, or a total of $3,529.10; and that he owed a balance of $6,238.-40, which he paid into court. He prayed for cancellation of the deeds of trust and promissory notes, or in the alternative, an allowance of the amounts he claimed as credits, less $979.30, and for a money decree against defendant Edwards for that amount.

The land deed, contract, drawing, bill of sale, chattel deed of trust, and addendum to the contract of October 31, 1959 were made exhibits to the bill of complaint.

Defendants, appellees here, answered the bill of complaint. They admitted ownership of the land and the existence of the deed of trust, but said the contract was incorrect because of typographical errors and failure to contain all of the agreements between the parties. They contended the complainant breached both the written and oral agreements, and denied he offered to settle with Mrs. Hart. They denied the amount tendered into court was sufficient to pay the indebtedness due them. Defendants denied Mrs. Hart agreed to or initialed the drawing appearing as an exhibit to the bill of complaint, and denied the drawing constituted the plans and spe-

cifications called for in the contract. They alleged the agreement called for Garrett to build houses complete and substantially identical with a house built by him for Cecil Brazeale, with certain departures as set out in their answer, and that the Brazeale house plans and specifications were to be used for the houses to be constructed for defendants. They denied he performed his contract in a proper and workmanlike manner, and alleged he failed and refused to complete the same.

Defendants admitted the land was consideration for the first six houses, but denied the cottonseed hulls were a part of the consideration. They alleged it was Garrett's duty to construct the houses according to the contract, the Brazeale house, and the oral agreements between the parties. They alleged the seventh house was to be built as the other six houses.

Defendants admitted Garrett had furnished but had not been paid for some electrical supplies. They alleged the consideration for the enlargement of the seventh house and the addition of a carport was to be $2500, not $3500 as claimed by complainant. They denied complainant is entitled to compensation for changes made by him under certain items of the addendum contract, but alleged he was, by mistake and false misrepresentation, overpaid $1,000 on the agreement to enlarge the seventh house and add a carport. *They admitted he is entitled to $136.50 for 220-volt outlets and large switch boxes for each of the seven houses, but denied he is entitled to any other amount claimed under the addendum contract or for the value of personal property allegedly taken by Jiles Edwards.

Defendants made their answer a cross bill, and alleged Garrett is indebted to the estate of Schneider or to Mrs. Hart $9,500 advanced to him, plus accrued interest; that he owes them $1,000 overpaid on the oral agreement on the seventh house, plus accrued interest; that he owes them for cottonseed hulls purchased from

Mr. Schneider in the amount of $700, plus accrued interest; that he breached his contract for the house construction in that he did not complete the houses or build them according to the contract and plans and specifications; that the workmanship in the houses was poor; that he ceased all work on or about September 8, 1960 and it was necessary to get others to complete the houses; that the cost for completing the seventh house is in excess of $2,232.72, and for the other six more than $1,270 each; that the work for such costs did not produce houses as good and valuable as he had agreed to construct; that the present difference is in excess of $5,000 for the seventh house and $3,400 for each of the other six houses. They contended the seventh house, if complete, would have a rental value of $85 per month, and the other six would have a rental value of $65 per month, and they claimed rents from January 1, 1961. They prayed for a decree allowing payment of rent and for foreclosure of the deeds of trust to satisfy such decree.

Complainant, appellant here, answered the cross bill and denied the alleged overpayment of $1,000 and the $700 debt for cottonseed hulls. He alleged rather that it was agreed orally that No. 2 pine paneling would be used in the six houses first contracted to be built, and that he used kiln dried paneling which is superior in quality to that agreed upon, and that he is entitled to a credit of $245. He denied the charge that he did not perform or complete his agreement and that the Brazeale house was to be a part of the plans and specifications, and reasserted his proper workmanship, denying it was necessary to have additional work done at defendants' expense to complete what he had contracted to do. He denied he owed any rental. After answering every allegation, he asked that the cross bill be dismissed.

The contract of October 31, 1959, filed as Exhibit A, is in part as follows:

"For valuable consideration, the contractors agree and guarantee to construct and erect on the Reva S. Hart property, located on the East side of North Central Street in the City of Winona, Mississippi, purchased from Ingram, during the year 1960, six 3-bedroom houses, size 28 feet by 36 feet, with the following materials.

"Block foundations, with curtain block walls 16 inches high; No. 2 2x8 floor joists; 24 inch centers; No. 2 lumber throughout; storm walls, celetox overhead; No. 2 pine paneling throughout; to be bricked up to the windows on the front, three red and three yellow; asbestos siding on balance of exterior walls; 215 pound asphalt roofing; 9 aluminum window units, with screens; common hardwood floors in all rooms except the bath, kitchen and hall, with 5/8 plywood floors in kitchen, bath and halls, sanded and covered with roll linoleum; wiring and light fixtures; 3 piece bathroom suite; all hardwood floors varnished; 8 lineal foot kitchen cabinets, with sink. The floors will be sanded, sealed and varnished two coats.

"All materials and labor to be furnished by Garrett except the heating, and all grading, . . . .

"The said houses will be construed according to the plans and specifications in the hands of William Garrett, which have been mutually agreed upon . . . .

"The above houses, with materials and labor thereon, will be paid by the contractors and they are to completely complete same during the year 1960 in a proper and workmanlike manner."

On November 14, 1959 the parties entered into a bill of sale contract, filed as Exhibit E, which is in part as follows:

"For and in consideration of the sum of One Dollar ($1.00) cash in hand paid, and the further consideration of the building of a house and the full payment of all materials and labor thereon by William

J. Garrett, said house to be built according to the same plans and specifications as the six houses described in the contract of October 31, 1959, with the exception of color, etc., said house to be placed on the lot of Reva S. Hart, if practicable, or on some other lot to be furnished by Joe Schneider, I, Joe Schneider, hereby convey and warrant unto William Garrett the following described equipment, tools and machinery located on the place to be purchased, in Montgomery County, Mississippi, to-wit:

| | |
|---|---|
| One Tractor | One Mowing Machine |
| One Cultivator | One Butane Gas Tank |
| Three Turning Plows | One Weed Killer |
| Three Middle Busters | Harrows |
| Three Discs | Horse drawn harrow |
| One liquid poisoner | Power tractor machinery |
| B tractor | Horse drawn equipment for poisoner |
| Cultivator for tractor | Cultivator shoes |
| One Blue Boy | Distributor |
| One Wagon | Cultipacker |

and all farm machinery and equipment, blacksmith tools, farm tools and agricultural machinery and tools, with the exception of five new feed troughs which are to be removed, and with the exception of the livestock and feed.

"This consideration given for the building of a house to be built by William Garrett, and he is to execute a deed of trust back to Joe Schneider for the sum of $2500.00, which said deed of trust is to be cancelled upon completion of the house."

This contract was signed by Joe Schneider. Mrs. Hart was not a party.

On February 23, 1960, the parties entered into an addendum contract, filed as Exhibit 1, as follows:

"For the sum of $1000.00 per house to be paid by owner, the Contractor, Garrett will do the following work and addition:

1. 24'' height foundation
2. 6 to 8 concrete 16 inches wide footing
3. 2-3/8 reinforced steel footing
4. Brick veneer each house
5. 20 inch overhand
6. Hip top each house (3 gables and 3 hips)
7. Inset each front door
8. Use celetox board on storm siding
9. Furnish 220 volt outlet in kitchen, material to be paid by owner
10. Furnish 4 current multibreaker for elec system at cost of $12.00 per house to be paid by the owner
11. Furnish 19 x 21'' lavatory instead of 17 x 19'' lavatory and the difference in price to be paid by owner.
12. Any other changes that come up provided that the owners paid the difference in materials.
13. It is further agreed that total amount to be loaned by owner is $15,000 agreed to be advanced and the additional $7000.00 herein. It is agreed that the contractor has already drawn $2000.00 and may draw $2000 more before March 1st, 1960 and will draw $3000 on April 1st, 1960 and when 1/3 of the work is completed with foundations furnished the contractor can draw out the rest of 1/3 of total (including all advanced; when 2/3 of work is done or building, are black outed the contractor can draw 1/3 of the total amount of $22,000.00 less 10 retainage and when buildings are finally and fully completed and inspected and all material and labor bill verified as paid, the remaining balance due will be paid.''

 It is contended by appellees and cross appellants that the contract is a lock and key job, except

for heating and grading. The appellant's contention is that the contract anticipates no greater degree of completion than he had given when he submitted the keys in September. The contract states "they are to completely complete same during the year 1960 in a proper and workmanlike manner." This means the buildings were to be constructed in full. Construing the contract and the testimony, the court said that a few years ago it would not have been conceivable that a building would be constructed less than fully and completely, but that partially constructed and shell homes had come into use in the building trade in recent years, and it was the court's opinion this contract called for shell houses. This was a contract written by an experienced attorney and signed by the parties, and the court thought it was necessary to give weight to every word and provision in it, and to interpret it by its four corners, with a conviction that the attorney used with deliberate intention what he put in it and with the same consideration left out of it what is not there. The court was not warranted or justified in writing into or taking out of the contract, or in rewriting the contract. In other words, the court did not want to take out or add to a written contract words of material legal consequence in upholding the contract. Williams v. Batson, 186 Miss. 248, 187 So. 236 (1939). *Batson* says that in construction of a contract the specific provisions also ordinarily qualify the meaning of general provisions when there is a conflict between them. From the reading of the instrument it does not contain all details necessary to build a house — shell or complete — and it is necessary to look elsewhere. There were plans and specifications prepared and in the hands of Mr. Garrett which were to guide the construction, and these were to be initialed. The drawing designated as plans and specifications, signed by Mr. Schneider, was exhibited to the bill of complaint, and was admitted as Exhibit C to Mr. Garrett's

testimony. There was no other set of plans and specifications submitted by anyone in the records. Since this is not a suit to reform a contract, but only to enforce it, the court could not rewrite the contract. The contract stated that the houses would be "constructed according to the plans and specifications in the hands of William Garrett, which have been mutually agreed upon by and between" the parties. The court held that no proof was proper to vary this solemn agreement.

■■ The proof shows that Mrs. Hart was not present when the contract was being read, but Mr. Hart was there. The testimony is that the plans and specifications were not there. Mr. Ringold and Mr. Hart testified that Mr. Garrett was to bring them by to be initialed. There was testimony that the Brazeale house was agreed upon as a model until plans and specifications were brought in. In spite of any evidence to the contrary, Mr. Schneider signed the contract as written, and later Mrs. Hart signed the same contract. Therefore they accepted what was in the contract. They had agreed to initial the contract. The adoption of the Brazeale house as a model, simultaneous with the execution of the contract, would be so inconsistent and contradictory to the contract that testimony to that effect was inadmissible as tending to vary the written contract.

■■■ The court noted that the plans and specifications contained the letters "O.K." and Mr. Schneider's signature. Mrs. Hart's name or initials are missing from it. The court did not regard the omission as fatal, reasoning that Mrs. Hart did not directly or through her husband have much connection with the contract or its performance until after Mr. Schneider's death. From the record this contract was largely a matter of his interest and his business. The addendum contract and the bill of sale did not include her as a party, since she did not sign the contract. It appeared that the plans and specifications referred to in the contract were the

same plans and specifications in all matters, except for certain changes included in the contract, and the court interpreted and held that the contracts of the parties could not be varied by testimony of events during and pending the life of Mr. Schneider. Apparently, from the record, everything proceeded agreeably until Mr. Schneider's death. We believe the court was correct in this ruling, and there was no reversible error.

Mr. Gillespie Bryant, who was acquainted with the building business, testified that while it was impossible to tell from the contract and plans and specifications how much of a house "ready for occupancy" was contemplated, it appeared that had the contracting parties intended it be ready for occupancy it would have been an easy matter to spell out a complete job, other than heating or grading, in better terms. It appears they had an attorney competent to write such a contract. From all of the contracts and plans and specifications it is hard for anyone to conceive that they contemplated a complete house ready in every respect for occupancy, and the testimony in the record is certainly in variance with the written contract.

The court found that the work done by Garrett was substantially as much as he was required to do under the contract. The court held testimony that the construction was to be the same as the Brazeale house was impossible, because it was in conflict with the clear wording of the written contract. There was not sufficient evidence to constitute an oral amendment of the contracts. The agreement was for "6 3-bedroom houses, size 28' x 36'," and to furnish all materials; at the same time the contract spells out that they will be built "with the following materials", and details the materials. A complete lock and key job could not have been done with just those materials mentioned.

 As to the provisions in the contract, "completely during the year 1960", and "to be fully finished dur-

ing the year 1960'', these refer only to the work under-
taken — whether shell or lock and key job. Since the
contract provided for its own plans and specifications,
no oral agreement simultaneously made could vary it,
including use of the Brazeale house as a model. The
court held in spite of many references to the testimony
about the Brazeale house, there was never an oral agree-
ment that the contract should be abandoned to the ex-
tent construction would be by the Brazeale house rather
than the contract, even though such an oral contract
later entered into could replace or amend the prior
written contract.

The court denied sums necessary to bring the house
into a state of readiness for occupancy, or the amounts
by which the houses when he left them were of less in
value than fully completed lock and key jobs. There was
much evidence which was in sharp conflict as to whether
the work actually done measured up to ''proper and
workmanlike manner.'' Experts on both sides testified.
The expert testifying for defendant could cite comment
only to windows, and the expert for the complainant
criticized only the linoleum. From the testimony and
proof, a court could easily conclude that Mr. Garrett
did an altogether praiseworthy job or that he did a
painfully poor job. The court, on motions of all parties, in
company with the attorneys, viewed the houses and made
an inspection, requesting the solicitors to point out the
good or bad as they wished. The court took a good
look for itself and concluded the product of the contract
was neither quite as fine as the most favorable testi-
mony for complainant nor nearly as bad as the most
favorable testimony of the defendant. The court stated
there appeared to be much good workmanship, certainly
much more than just the windows. The view must have
been very helpful to the court, for it gave it a conception
of the houses and the work which it had been unable
to get from the testimony.

There was testimony about standard workmanship and substandard workmanship, No. 1 construction and No. 2 construction. The contract called for No. 2 lumber and pine paneling, and the contractor used kiln dried paneling. The product of "proper and workmanlike" construction must be directly affected by the material with which the work is to be done, and the standard of the work. Here No. 2 lumber was provided throughout, and common hardwood floors were specified, and the product would not be nearly as perfect as if the best grade of materials had been agreed upon and used, or No. 1 construction. However, there were certain details observed where, regardless of the materials used, there was performance of lesser grade than contractually provided, and the court was confident Mr. Garrett would make certain corrections that should be made.

From many days of hearing and the view that he had made, the court was of the opinion certain corrections should be made in the houses. Since the parties could come to no agreement as to the corrections necessary and the costs therefor, on October 6, 1961 the chancellor entered a decree referring the matter to Herman A. Smith as master. There seemed to be no agreement as to the procedure at this point. No objections were made. The court entered an order, after consideration of the proof given and the viewing by the court, concluding that certain corrections should be made, and outlining in part to the master what was to be done, what the court had in mind, and directing the master to view the premises and estimate the corrections needed. The court stated that work needed in each of the houses should be determined and corrected, since the defendants had, by their own workmen, done additional work in five houses.

The court gave other details and itemized further corrections to be made if practicable, or, if not practicable, said the amount by which the fair cash market

value of the houses is reduced by their existence should be determined. Then he outlined four other things that should be looked into, saying these and other costs of finishing materials should be charged to complainant. However, he could not determine from the record reasonable costs for all the work, and for this reason he appointed a master. The parties, while not agreeing that the matters detailed should be corrected or whether they all required correction, agreed, nevertheless, to the appointment of the master. It was ordered that, after taking the oath required, he should "proceed to the premises and otherwise as shall be necessary for the purpose, and arrive at the reasonable cost of making each of the corrections specified in the paragraphs above, including those which may be necessary to the other five houses, and determine whether the conditions, or any of them, detailed above, may be feasibly corrected, and, if so, the reasonable cost of the same, and, if all or any of them may not be corrected feasibly, then the amount or amounts by which the fair cash market value of the several houses where the same exist, is reduced by the existence of such condition or conditions."

The master's report showed House 1 needed nine corrections at a cost of $499.25; House 2 needed ten corrections at a cost of $432.50; House 3 needed eleven corrections at a cost of $684.25; House 4 needed twelve corrections at a cost of $584.50; House 5 needed ten corrections at a cost of $502.50; House 6 needed ten corrections at a cost of $895.50; and House 7 needed fifteen corrections at a cost of $1,188.75.

Appellant assigns as error as a matter of law the chancellor's overruling of his motion to vacate and set aside the master's report, in deciding himself the issues of fact after having referred the same to a master for determination. The court permitted testimony by both parties, and several witnesses for each were permitted to testify at length as to what corrections they thought

should be made. There were expert witnesses on both sides. After the lengthy hearing the court decided all corrections that were changed from the master's report were in favor of the appellant.

 ■ It appears to this Court from the record that the learned chancellor was justified in sending Mr. Smith, an expert witness in the construction business, to make estimates to aid the court. We find from the record that no special objection was made to the appointment of Mr. Smith as expert witness on behalf of the court. No offer was made to enter any testimony before Mr. Smith when he was estimating the corrections that should be made. It is to be noted that when the lengthy trial on this report was made, that no subpoena was made requesting Mr. Smith to testify in the case. Apparently, from the record, the appellant agreed to the appointment of the master as an expert witness on behalf of the chancellor, made no offer of proof before Mr. Smith at any time while he was making his investigation and waited until after he had made his final report to the chancellor to offer testimony or seem to object. We feel that the chancellor did not commit reversible error in this appointment and consideration of his testimony or report.

 ■ The court in this case did not give the "master's report" or expert witness's testimony the weight of a jury verdict. Instead, the chancellor gave the report the same weight as he would have given the testimony of any expert witness, and he offered the parties an opportunity to present evidence for his consideration and rebuttal to the report, and, as stated, much evidence was given. It is true the court in the appointment of a witness should permit the parties to cross examine him as to his findings and testimony (or report). Since there was no request for an opportunity to cross examine the witness, we see no error in the hearing on the report. The chancellor reopened this

case for the purpose of giving both parties an opportunity to go into each item of correction that was offered.

The court finally allowed defendants and cross-complainants the amount of the loan to Mr. Garrett, $9,500, plus the cost of correcting workmanship, $4,486.75, and the price of the cottonseed hulls, $700.00, or a total of $14,686.75. Against this amount Mr. Garrett was allowed credits as follows: $300.00 for bathtub, etc. taken from premises; $136.50 for 220-volt outlets and switch boxes; $36.00, felt furnished for roofs; $105.00, increase in cost on concrete porch; $245.00, increase in cost of pine paneling; $980, installation of closets; and $6,238.40, already paid into court. These credits totaled $8,040.90, and when deducted from the charges of $14,686.75, left a balance due defendants and cross-complainants of $6,645.86.

The court ruled that the complainant's tendering of $6,238.40 into court did not stop accrual of interest, and that the full amount owing, except for the $700 for cottonseed hulls, and amounts for credits due him, should bear interest at the rate and from the time or times provided in the notes and deeds of trust. The interest on $700 due for the cottonseed hulls, at legal rate, was to begin on the date of the decree.

He further decreed that on payment of amounts to appellees and cross-appellants that the deeds of trust and notes would be cancelled, and certain allowances made for costs to the master.

From the lengthy record as to the allowances and disallowances on certain claims and the corrections, both of appellant and appellees, it appears the chancellor was eminently correct in his rulings, both allowing and disallowing certain claims and corrections. We believe that the chancellor was not manifestly wrong in any of his rulings. We believe that the contentions of the parties from the evidence justify the court in his rulings, in that the testimony was conflicting, and we find no re-

versible error in either his rulings for one party or against the other party, and if there were any errors, they were not reversible errors. The case is therefore affirmed as to the direct appeal and the cross appeal.

Affirmed.

*Kyle, P. J., and Gillespie, Jones and Brady, JJ.,* concur.