## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 93-CA-00144-SCT

*J. O. HOOKER AND SONS, INC.*

*v.*

*ROBERTS CABINET CO., INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/16/92 |
| TRIAL JUDGE: | HON. JOHN B. TONEY |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COU |
| ATTORNEY FOR APPELLANT: | ANSELM J. MCLAURIN |
| ATTORNEY FOR APPELLEE: | WES W. PETERS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED ON CONDITION OF R |
| | IF REMITTITUR REFUSED, REVE |
| | REMANDED FOR NEW TRIAL ON |
| | 11/7/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/2/96 |

**BEFORE PRATHER, P.J., BANKS AND SMITH, JJ.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

### I. INTRODUCTION

¶1. This case calls upon this Court to review the granting of a motion for summary judgment in favor of a subcontractor against a general contractor who breached a subcontract agreement. This Court considers the granting of the summary judgment motion to have been well taken, but we order a remittitur of $1,260 to the amount of $41,610.

### II. STATEMENT OF THE FACTS

¶2. In 1991, J.O. Hooker & Sons, Inc. ("Hooker") served as the general contractor for the renovation of residences owned by the Bessemer Public Housing Authority ("BPHA") in Bessemer, Alabama. The renovation involved tearing out fixtures, such as cabinets, and Hooker's contract with the BPHA provided that the BPHA, as the owner of the property, had the option to either keep or salvage fixtures which needed to be torn out during the renovation process. The contract further provided that, in the event that the BPHA elected to keep the cabinets, Hooker would be required to remove the cabinets and move them to a location of the BPHA's choosing. Under said general

contract, the cabinets were to become the property of Hooker and to be removed by him in the event that the BPHA elected not to keep said cabinets.

¶3. Hooker entered into a subcontract agreement with Roberts Cabinet Co., Inc. ("Roberts"), pursuant to which Roberts was required to "furnish cabinets, tops, plastic laminates on walls and furr down materials and fronts for hot water heaters as per plans and specs for the price listed below." The agreement also provided that "the price includes the cost of tear-out (sic.) old cabinets and installation of new cabinets."

¶4. As the date when the cabinets would be needed approached, Roberts informed Hooker that he had underestimated the costs of the job and demanded an additional $23,000, which, Hooker asserts, he had no choice but to pay given the time constraints which were present. Later, a dispute arose between Hooker and Roberts as to which party had the duty to dispose of the cabinets as the BPHA required in the general contract. Roberts asserted that the subcontract did not obligate him to dispose of the cabinets, but Hooker contends that the "as per specs and plans" language in the subcontract agreement served to incorporate by reference the general contract and that Roberts thus assumed Hooker's duties to dispose of the cabinets.

¶5. The parties were unable to resolve their dispute, and on December 13, 1991, Hooker sent Roberts a fax in which he stated that he had consulted with his lawyer and was considering the contract null and void. Hooker offered to buy from Roberts the cabinets that Roberts had already constructed, but the parties were unable to come to an agreement.

### III. STATEMENT OF THE CASE

¶**6.** On December 18, 1991, Roberts Cabinet Co., Inc. filed suit against J.O. Hooker & Sons, Inc., alleging that Hooker had wrongfully breached a subcontract agreement with Roberts after Roberts had already begun performance. On September 16, 1992, the trial court granted summary judgment in favor of Roberts, finding that Hooker had no legal right to unilaterally terminate the contract in the present case.

¶7. On December 10, 1992, a trial was held for the sole purpose of determining the amount of damages suffered by Roberts as a result of Hooker's actions, and a jury determined Robert's damages to be in the amount of $ 42,870. On January 8, 1993, the trial court denied Hooker's motions for a new trial or in the alternative a remittitur of the jury's verdict, and Hooker filed a timely appeal.

> ### IV. WHETHER THE LOWER COURT ERRED IN GRANTING SUMMARY JUDGMENT AGAINST J. O. HOOKER & SONS, INC., ON THE ISSUE OF LIABILITY.
>
> **A. Was there a genuine issue of material fact with regard to whether Hooker or Roberts had the duty to dispose of the cabinets in question ?**

¶8. This Court reviews *de novo* the record on appeal from a grant of a motion for summary judgment. In **Brown v. Credit Center, Inc.** 444 So.2d 358, 362 (Miss. 1983) this Court interpreted Rule 56 and the standards that the trial court should use in considering a motion for summary judgment. This Court explained that:

> The trial court must review carefully all of the evidentiary matters before it -- admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If in this view the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise the motion should be denied. *Brown*, 444 So.2d at 362.

*Northern Electric Co. v. Phillips*, 660 So.2d 1278, 1281 (Miss. 1995), quoting *Brown v. Credit Center, Inc.* 444 So.2d 358, 362 (Miss. 1983)

¶9. Hooker argues that the trial court was in error in granting Roberts' motion for summary judgment on the issue of liability, given that disputed issues of fact remained which, Hooker contends, should have been resolved by the jury rather than the judge. Specifically, Hooker asserts that there was a disputed issue of fact as to whether Roberts had the duty of carrying away and disposing of the cabinets which were removed from the dwellings in question.

¶10. Hooker asserts that the contract in question should be interpreted in the context of Article 2 of the Uniform Commercial Code, Miss. Code Ann. §75-2-101 et seq., given that the transaction involved was for the sale of goods, namely cabinets. Hooker cites no authority for this proposition, and Roberts does not address this issue at all, but it is of importance to determine what law should apply to the contract. There appear to be no Mississippi cases directly on point, but this Court finds that, although the transaction in this case did involve a sale of goods, the dispute in this case actually concerns the performance of services and the delegation of duties under a contract.

¶11. A number of states which have considered this issue have concluded, based on an interpretation of UCC § 2-102, that Article 2 does not apply to construction or service contracts. See *Perlmutter v. Don's Ford, Inc.*, 409 N.Y.S. 2d 628 (1978); *Christiansen Bros., Inc. v. State*, 586 P.2d 840 (Wash. 1978). The present contract, however, is properly viewed as a mixed transaction of goods and services, and courts have reached differing conclusions as to whether the UCC should apply to such mixed transactions.

¶12. In *Snyder v. Herbert Greenbaum & Associates, Inc.*, 380 A.2d 618 (Md. App. 1977), the Maryland Court of Appeals held that a contract for the installation of carpeting in a large apartment complex was primarily a contract for sale, rather than installation, of such carpeting and thus was subject to UCC Article 2. In *Freeman v. Shannon Const., Inc.*, 560 S.W.2d 732 (Tex. Civ. App. 7th Dist. 1977), by contrast, a Texas appellate court held that a contract between a general contractor and subcontractor, pursuant to which the subcontractor was to complete cement construction work on an apartment project, was in essence a service contract, even though it did involve the transfer of goods, and thus the UCC should not apply.

¶13. It is very often the case that a construction contract will involve the furnishing of goods by a subcontractor, and this Court holds that, in such a mixed transaction, whether or not the contract should be interpreted under the UCC or our general contract law should depend upon the nature of the contract and also upon whether the *dispute* in question primarily concerns the goods furnished or the services rendered under the contract. The present case clearly does not concern the cabinets manufactured, but rather the refusal of Roberts to assume duties which Hooker contractually obligated itself to perform. This Court would not hesitate to apply Article 2 if the present case involved, for example, a dispute over the quality of the cabinets, but the present case is in actuality a

fairly standard contract dispute involving delegation of duties under a contract and the right to unilaterally rescind said contract. The fact that goods were furnished in the present contract has no bearing on the legal analysis involved, given that the dispute in this case clearly concerns the service aspect of this mixed transaction.

¶14. Hooker's desire to have this contract interpreted under the provisions of the UCC is based on the fact that Miss. Code Ann. § 75-2-202 (1972), which contains the UCC version of the parol evidence rule, provides a more permissive approach for the admission of extrinsic evidence than that found in our general body of law. Specifically, § 75-2-202 does not require that the agreement in question first be found to be incomplete or ambiguous before evidence of course of dealing and usage of trade may be considered.

¶15. Under our general, non-UCC, parol evidence rule, by contrast, a document must first be found to be incomplete or ambiguous before said document may be explained, but not contradicted, by extrinsic evidence. ***Busching v. Griffin***, 542 So.2d 860 (Miss. 1989). In ***Busching***, Griffin sold an option to purchase property for $50,000, and, upon deciding that said price was too low, breached the option contract, asserting that she thought that the option price was a loan to pay her taxes. ***Busching,*** 542 So.2d at 861. The trial court accepted Griffin's argument, but this Court reversed, finding that the contract in question was not ambiguous and thus that Griffin could not introduce extrinsic evidence to supplement said contract. ***Id.*** at 865.

¶16. As in ***Busching***, the subcontract in the present case is clear and unambiguous in that it clearly provides that Roberts' bid price includes the cost of tearing out and installing new cabinets, but is completely silent as to any duty on the part of Roberts to dispose of the cabinets. Hooker concedes that the subcontract with Roberts was silent on this issue, but argues that the "specifications for the general contract disclosed that this was within the kitchen cabinet portion of the job." Hooker argues that the general contract between himself and the BPHA was incorporated by reference into the subcontract with Roberts, given that the subcontract provides in part that:

> We agree to furnish cabinets, tops, plastic laminate on walls and furr down materials and fronts for hot water heaters ***as per plans and specs*** for the price listed below. (emphasis added).

Hooker asserts that "[t]he specifications on the kitchen cabinet portion of the job, included in the Roberts-Hooker contract by reference, provided that the scope of the job included removing all existing kitchen cabinets and shelves and disposing of them in accordance with local laws and ordinances." It is true that the subcontract refers to the "plans and specs" of the general contract, but said language does not in any way indicate an intent by Roberts to assume additional and expensive duties which were not set forth in the subcontract. The term "as per specs and plans" is better understood as applying to the "furnish[ing]" of cabinets and not to their "removal."

¶17. The parties cite several cases in support of their respective positions. Roberts cites ***Perry v. Newell***, 146 F.2d 398 (5th Cir. 1945), which is factually similar to the present case. In ***Perry***, the subcontract in question similarly incorporated by reference the "plans and specifications" of the general contract, which general contract included provisions for electrical work on the exterior of buildings being constructed. Perry, the general contractor, asserted that said incorporation by reference of the general contract served to obligate Newell as the subcontractor to the performance of the outside electrical work, given that Newell was responsible for electrical work. The trial court

and the Fifth Circuit found in favor of Newell, but only upon a finding that the subcontract "expressly limit(ed) the work to be done by him to the wiring inside the buildings referred to in it". **Perry**, 146 F.2d at 400. The Fifth Circuit stated in **Perry**:

> We reaffirm here ... that while a reference in a subcontract to the provisions, plans, and specifications of a general contract imports them into the subcontract where not inconsistent with its terms, it is quite well settled that such a reference is not effective beyond this, and that if the subcontract contains *words of definite limitation* (emphasis added) they will be given effect and the reference limited accordingly. **Id.**

As noted by Hooker, the subcontract in the present case clearly does not provide such "words of definite limitation," and the value of **Perry** as persuasive authority in favor of Roberts' position is limited.

¶18. Roberts also cites the case of **Garrett v. Hart**, 250 Miss. 822, 168 So.2d 497 (1964), but **Garrett** is factually dissimilar to the present case, given that, in **Garrett**, "it was impossible to tell from the contract and plans and specifications how much of a house `ready for occupancy' was contemplated." **Garrett**, 250 Miss. at 836, 168 So.2d at 503. Thus, the plans and specifications in **Garrett** did not assist in resolving the main issue in said case, and the case centered largely around matters which are dissimilar from the present case.

¶19. Hooker cites the case of **Roberts v. Robertson**, 232 Miss. 796, 100 So. 2d 586 (Miss. 1958), in which this Court held that:

> It is generally held that where a building contract refers to plans and specifications and so makes them a part of it, the contract is to be construed as to its terms and scope together with the plans and specifications. **Robertson**, 232 Miss. at 802, 100 So.2d at 588.

In **Robertson**, the dispute centered around whether the subcontractor was required under the subcontract to insulate the pipes, and this Court determined that he did have such a duty based partly on the incorporation by reference of the plans and specifications of the general contract. As Roberts notes in his brief, however, **Robertson** is distinguishable from the present case in that the subcontract in **Robertson** clearly provided that the subcontractor would perform "all work" relating to the piping. Thus, none of the cases cited by either party provide strong authority with regard to the issues in the present case, and this Court turns instead to an analysis of whether Hooker presented a genuine issue of material fact as to whether Roberts had a duty to dispose of the cabinets in question.

¶20. In arguing that a fact issue existed, Hooker asserted in his affidavit that:

> It is very rare for a subcontractor such as Roberts not to do their own cleanup. The only time we have ever contracted with a sub-contractor who did not handle their own cleanup was when the job was within driving distance of our office in Thaxton, Mississippi.

The duty of Hooker to remove the cabinets in the present case, however, arose from specific and detailed contractual provisions entered into between Hooker and the BPHA. The subcontract agreement, as noted earlier, expressly provided that the bid price included the "tear-out" and installation of the cabinets. If Hooker had desired that Roberts be obligated to assume the specific

contractual obligations set forth in the general contract to dispose of the cabinets, then it would have been a simple matter to include in the subcontract language obligating Roberts to do so.

¶21. It would have been highly advisable for Hooker to have insisted on such language in the subcontract, regardless of his understandings regarding industry customs. This Court is hesitant to find that parties have impliedly assumed obligations to perform expensive duties based on vague assertions of industry custom when the assumption of said duties could easily have been provided for in the subcontract. This Court is especially reluctant to do so in the present case, given that the duties involved are not general obligations to remove materials, but rather specific tasks which Hooker contractually obligated himself to perform.

¶22. On these facts, this Court concludes that, as a matter of law, Roberts did not assume the specific contractual duties relating to the removal of the cabinets, and that there accordingly exists no genuine issues of material fact with regard to this issue. The trial judge was therefore correct in granting summary judgment in favor of Roberts with regard to the issue of liability.

> **B. Assuming that a material issue of fact does exist with regard to the duty to dispose of the cabinets, was Hooker nevertheless in error as a matter of law in unilaterally terminating the contract as a result of Robert's alleged breach thereof ?**

¶23. As noted above, this Court concludes that Hooker failed to raise a genuine issue of material fact regarding the responsibility of Roberts to dispose of the cabinets. Even if this Court had found that there existed a genuine issue of material fact regarding the duty of disposing of the cabinets, this Court is faced with the actions of Hooker in unilaterally terminating the contract. In his summary judgment ruling, the trial judge ruled that:

> The Defendant did not have the right to unilaterally rescind or otherwise terminate its contract with Plaintiff, and that the Plaintiff is entitled to Judgment as to the Liability as a matter of law.

As such, the language of the Chancellor's ruling indicates that he considered Hooker to have had no right to terminate the contract, and that said consideration motivated the summary judgment ruling with regard to the issue of liability.

¶24. It is a matter of basic contract law that every breach does not give a party the right to unilaterally terminate a contract, as long as the breaching party has substantially performed his duties under the contract. *Gulf South Capital Corp. v. Brown*, 183 So.2d 802 (Miss. 1966). If Hooker had felt that Roberts had breached the contract, then he could have assumed the responsibilities for removing the cabinets himself and filed suit against Roberts for the $4,000 to $6,000 cost of doing so. Given the eventual jury verdict of over forty thousand dollars against Hooker, such a decision may well have been the prudent one for him. Instead, Hooker chose to terminate the contract, and in doing so, subjected his actions to a rather stringent legal analysis.

¶25. In evaluating Hooker's actions in unilaterally rescinding the contract, it must be determined whether Roberts materially breached the contract, thus entitling Hooker to legally rescind said contract. This Court held in *UHS-Qualicare v. Gulf Coast Community Hosp., Inc.*, 525 So.2d 746, 756 (Miss. 1987), that:

The termination of a contract is an "extreme" remedy that should be "sparsely granted." [citations omitted]. Termination is permitted only for a material breach. A breach is material when there "is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose," *Gulf South Capital Corp. v. Brown*, 183 So.2d 802, 805 (Miss. 1986), or when "the breach of the contract is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract," *Matheney v. McClain*, 248 Miss. 842, 849, 161 So.2d 516, 520 (1964).

¶26. Hooker asserts that his rescission of the contract arose in large part from Roberts' successful efforts to secure additional monies from Hooker as the date when the cabinets were needed approached. To wit, Hooker stated in his affidavit that:

Around the middle of October, 1991, as the job was nearing the time when the cabinets would be needed, Kevin Roberts called and stated that his father had made a mistake on their bid of about $23,000.00, and that they would be unable to do the job. At this time, we were in a serious time constraint and were at the mercy of Roberts Cabinet Co., Inc. We felt that we had no recourse but to go up on the price to be paid for them and we agreed to let them increase their price even though this was going to cause us to lose money on this portion of the work.

Thus, it is Hooker's assertion that he was concerned with a general course of conduct on the part of Roberts, which, Hooker asserts, amounted to a coercive attempt to secure additional funds for tasks which Roberts was already obligated to perform.

¶27. In response to an interrogatory from Roberts, Hooker explained his reason for terminating the contract thusly:

After we determined that Roberts Cabinet Co. was, in our opinion, only out to increase the amount of their contract by any means possible and we had already exceeded our allowance for this portion of the contract, we felt we had no alternative but to trade with someone else.

Hooker may have genuinely felt that Roberts was attempting to "squeeze" additional money from him, but the fact remains that Hooker could have insisted that the subcontract with Roberts contain language obligating Roberts to assume the duties of disposing of the cabinets, but he failed to do so. Further, once it became clear that Roberts would not perform the removal of the cabinets, Hooker could have, as mentioned earlier, removed the cabinets himself and sued Roberts for the cost of doing so. Based on these facts, the actions by Roberts did not amount to a material breach of the contract entitling Hooker to unilaterally rescind the entire contract.

¶28. Accordingly, the summary judgment ruling granted by the trial judge with regard to the issue of liability is affirmed.

### V. WERE THE DAMAGES AWARDED BY THE JURY WERE THE RESULT OF BIAS, PASSION AND PREJUDICE, AND/OR AGAINST THE WEIGHT OF THE OVERWHELMING EVIDENCE ?

¶29. Hooker alternatively argues that this Court should grant a substantial remittitur based on the

damages in the jury's verdict being against the overwhelming weight of the evidence. Miss. Code Ann. § 11-1-55, "Authority to impose condition of additur or remittitur", provides:

> The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of the credible evidence. If such additur or remittitur be not accepted then the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.

¶30. Plaintiff's Exhibit 6 listed the following damages:

> $ 5,117.28 Net Loss on Manufactured Cabinets
>
> $ 3,775.04 Countertops
>
> $ 886.25 Laminate
>
> $ 72.38 Travel Expenses
>
> $ 1,760.00 Administrative Time
>
> $ 1,440.00 Storage of Cabinets
>
> $30,000.00 Lost profit on job (lowered)
>
> $43.050.95 Total Damages

¶31. Although Roberts originally requested $51,309.29 in total damages, he was shown on cross-examination to have overestimated his lost profits, and Roberts accordingly lowered his total damages requested during closing arguments to $43,050.95. The excessive amount claimed was due to an accounting error and is not a subject of dispute in this appeal. Hooker does not contest on appeal the jury's awards with regard to the first four items listed above, namely the net loss on the manufactured cabinets, as well as the countertops, laminate, and travel expenses. Hooker does, however, contest the jury's awards relating to the storage and administrative costs, and, especially, the lost profits. These damages will be considered separately.

### A. Storage and Administrative Costs

¶32. With regard to the storage costs for the cabinets, it is clear that Roberts would have incurred said costs regardless of any breach on the part of Hooker, given that the cabinets were stored in space which Roberts had already leased. Roberts argues that:

> As to the cost of storage, Hooker suggests that Roberts cannot allocate any costs for storage, because it was storing them in a building that it was paying rent on anyway. However, it was paying rent for a 30,000 square foot building. As a result of Hooker's breach, it was paying the

same rent but on a reduced square foot building. Roberts only applied the percentage of the lease which was specifically attributable to the area being used to store Hooker's cabinets. Therefore, these costs are directly attributable to Hooker's breach.

¶33. Roberts' argument is without merit. Roberts is only entitled to recover damages for expenses in storing the cabinets that it would not otherwise have incurred absent Hooker's breach. As noted by Hooker, Roberts was not forced to rent additional space to store the cabinets, but merely utilized storage facilities that it had already leased. Roberts' rental fees were not raised a single penny by the storage of the cabinets in question, and it was not forced to rent additional space to store other materials as a result of a lack of space arising from the storage of the cabinets. Roberts' claim for recovery in this regard is based solely on the abstract economic value of previously empty storage space which it filled with the cabinets in question. Allowing Roberts to recover for the cost of storing the cabinets would place it in a better position than if the contract had been fully performed. Under these facts, Roberts' claimed damages of $1,440 for storage costs are disallowed in their entirety.

¶34. A somewhat similar analysis may appear to apply with regard to the "administrative time" damages of $1,760 which were cited by Roberts as having been incurred in paying Kevin Roberts for his time as general manager. With regard to these damages, Roberts argues that:

> Finally, as to the percentage of the general manager's salary allocated as damages, Hooker suggests that this percentage of the salary which was applicable to time spent on Hooker's project was not recoverable, because the general manager was paid this salary anyway. However, Hooker misses the point. The general manager is not the Plaintiff in this action. Rather, Roberts is the Plaintiff in this action. Paying the general manager a salary to work on a contract which cannot be performed is the equivalent of paying the general manager a salary for reading the newspaper. It is wasted money and time that could have been spent on a contract that it was allowed to perform. Consequently, although the general manager may not have lost his salary, Roberts lost the benefit from paying its general manager this salary.

As with the expenses relating to storage space, Roberts' expenses in paying Kevin Roberts were exactly the same as they would have been if Hooker had not breached the contract. Kevin Roberts' salary, however, is not comparable to the storage costs in an important respect.

¶35. It is clear that the time which Kevin spent working on the Hooker project could, and presumably would, have been spent productively in other projects. As such, Roberts suffered an economic loss by having to pay an important employee his salary for working on a contract which would eventually be canceled. Kevin testified that he spent approximately forty percent of his working hours over a two-month period on the Hooker project. It is true that Roberts would have paid Kevin regardless of whether he had spent that time working on the Hooker project. However, the distinction is that, unless reimbursed for these expenses, the salary paid by Roberts for this time spent will have been paid for no resulting economic value. Given that Kevin Roberts was a salaried employee of Roberts who was directly engaged in working on the Hooker project, it can not be disputed that Roberts suffered expenses related to the contract in question by paying Kevin for his work.

¶36. The issue arises as to whether compensating Roberts for both its lost profits and for the salary of Kevin Roberts would amount to a double recovery. The answer to this question depends upon whether Kevin Roberts' salary was included in the $120,000 in expenses which Roberts estimated it

would have incurred in completing the project. If said salary was included in the expenses, then the recovery would not amount to a double recovery, given that the amount of the salary would have already served to reduce the amount of profits in the calculation of damages.

¶37. The record does not reveal whether Roberts included an estimate of Kevin Roberts' salary allocable to the Hooker contract in his determination of his expenses. It is reasonable to assume, however, that a subcontractor includes in his bid estimate the salaries which he will be required to pay to all employees who will be directly involved in the project in question. It naturally adds to the expense of a project if a company is required to utilize the services of managerial personnel who may be unable to perform other tasks as a result of said project. Roberts suffered expenses by paying Kevin Roberts his salary without being able to utilize his expertise on other jobs for which they would be receiving the full amount of contract value. On these facts, it can not be said that the jury's awarding of these administrative costs was against the overwhelming weight of the evidence.

### B. Lost Profits

¶38. The main issue with regard to damages in this appeal concerns the extent of Roberts' lost profits as a result of the breach by Hooker. In awarding damages for breach of contract, this Court's purpose is to put the injured party in as good a position as he would have been in but for the breach. *Universal Life Ins. Co. v. Veasley*, 610 So.2d 290, 295 (Miss. 1992). 22 *AmJur2d* "Damages" §45 notes that:

> Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of the bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.

It is clear that damages awarded by the jury were in the nature of expectation damages, and said damages included Roberts' lost profit from the deal, along with expenses that Roberts incurred in manufacturing the cabinets that it was unable to mitigate. The jury's awarding of Roberts' direct expenses in partially performing the contract in addition to lost profits was entirely proper, given that failing to do so would under-compensate Roberts by forcing him to pay for said expenses out of his net profits.

¶39. Of considerable dispute at trial was Robert's claimed profit percentage on the deal with Hooker of twenty-six percent. Hooker testified that such a percentage was not a "usual and ordinary profit to be expected in the construction business" and that one would be unable to "win any jobs on public works with bids including a 26% profit margin." Hooker testified that his usual profit margin was approximately 4%, although Roberts argued that a manufacturer such as Roberts should expect a greater profit margin than a general contractor such as Hooker.

¶40. Also in dispute at trial was the evidence regarding the daily manufacturing output of Roberts' factory and the number of days that the production was curtailed at said factory as a result of the breach by Hooker. Kevin testified at trial that Roberts' average daily manufacturing output was between $6,000 and $8,000 in 1991, although he estimated during discovery that such output amounted to only $6,000. Hooker asserts that, even assuming that the twenty-six percent profit margin is correct, the $6,000/day output constitutes a gross sales figure, and that Roberts would thus

only expect a profit of approximately $1,500/day from the contract.

¶41. Hooker thus argues that Roberts' lost profits should be measured by the four-day period during which production at Roberts' factory was shut down. However, the shut-down period at the factory would be much more relevant with regard to determining the amount of consequential damages resulting from the breach rather than measuring Roberts' amount of lost profits. The relevant inquiry is not the amount of profit that Roberts would have been able to make in the four days that the factory was shut down, but rather the amount of profit it would have been able to make on the *deal as a whole* had the contract not been breached by Hooker.

¶42. Roberts' daily manufacturing output would only be relevant in determining the amount of lost profits on the deal as a whole if it could be shown exactly how many days it would have taken for Roberts to manufacture the cabinets, and there was no exact proof in this regard at trial. Given the bid price of over $150,000, however, it is clear that it would have taken Roberts many more than four days to complete the contract, considering the daily manufacturing output of the factory of only $6,000/day. Kevin testified that the factory was capable of generating a daily production output considerably in excess of $6,000/day, but the completion of the contract would have taken weeks even at an increased rate of production.

¶43. Kevin testified that, in making his bid, he estimated the costs that his company would have incurred in manufacturing the cabinets to be approximately $120,000, and then factored in his desired profit margin of twenty-six percent, for a total of an approximately $151,000 total bid. Thus, Kevin testified that, had the contract been completed, Roberts expected to receive a profit of around thirty thousand dollars. Bids in construction situations are rarely susceptible of exact proof as to what the manufacturing costs and profits would have been, and, while the profit margin of twenty-six percent may appear high, Hooker's sole proof regarding the excessive nature of Roberts' claimed profit margin was his testimony regarding his own experiences as a general contractor, rather than a manufacturer/subcontractor.

¶44. This Court thus has only the conflicting testimony of Hooker and Roberts with which to determine the true profit margin, and, on these, facts, it can not be said that the jury's verdict was against the overwhelming weight of the evidence. This Court has a rather limited scope of review on appeal of a denial of a motion for remittitur. This Court noted in *Odom v. Roberts*, 606 So.2d 114, 121-22 (Miss. 1992), that:

> Where the trial court has denied a remittitur, the defendant may appeal to this court on grounds (that) the trial court abused its discretion in failing to order the remittitur and, if he can convince the court on that score, may argue that the damage award be reduced to such amount as would no longer be contrary to the overwhelming weight of credible evidence. If the defendant should be successful, to any extent, the plaintiff would then have the option of accepting the remittitur or going to trial again on the issue of damages only.

¶45. The only damages granted by the jury which this Court considers to be against the overwhelming weight of the evidence are the damages for the storage of the cabinets. While the storage costs constitute a rather insignificant portion of the damages, the fact remains that the awarding of the $1440 in storage costs was clearly erroneous and an abuse of discretion, given that Hooker suffered no real economic loss as a result of being forced to store the cabinets at his factory.

Having established that a rather minor remittitur is in order, this Court's role is to reduce the damages to such an amount that the verdict is not in conflict with the overwhelming weight of the evidence.

¶46. Accordingly, this Court grants a remittitur of $1,260.00, which constitutes the difference between the $42,870.00 sum awarded by the jury and the sum of $41,610.00, which, this Court concludes, is not against the overwhelming weight of the evidence.

$ 5,117.28 Net Loss on Manufactured Cabinets

$ 3,775.04 Countertops

$ 886.25 Laminate

$ 72.38 Travel Expenses

$ 1,760.00 Administrative Time

$30,000.00 Lost profit on job

= $41,610.00 proper amount of damages

**¶47. AFFIRMED ON CONDITION OF REMITTITUR; IF REMITTITUR REFUSED, REVERSED AND REMANDED FOR A NEW TRIAL ON DAMAGES ONLY.**

**SULLIVAN, P.J., PITTMAN, BANKS, SMITH AND MILLS, JJ., CONCUR. LEE, C.J., AND McRAE, J., CONCUR IN RESULT ONLY. ROBERTS, J., NOT PARTICIPATING.**