Alfred Kwamena NEWTON and Florita
S. Newton, Petitioners,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 83–3246.

United States Court of Appeals,
Sixth Circuit.

Argued April 31, 1984.

Decided June 7, 1984.

Mario H. Cisneros (argued), Detroit, Mich., for petitioners.

Immigration & Naturalization Serv., Cincinnati, Ohio, David V. Bernal (LC) (argued), Office of Immigration Litigation, Criminal Div., Thomas W. Hussey, Washington, D.C., Nicholas J. Pantel, Asst. U.S. Atty., Cincinnati, Ohio, for respondent.

Before KEITH, Circuit Judge, WEICK, Senior Circuit Judge, and REED, District Judge.*

WEICK, Senior Circuit Judge.

Petitioners Alfred K. and Florita S. Newton, husband and wife, have petitioned this Court for review of the Board of Immigration Appeals decision affirming the order for their deportation. The Immigration and Naturalization Service (INS) alleges, and Petitioners concede, deportability under Section 241(a)(2) and (9) of the Immigration and Nationality Act (the Act), 8 U.S.C. § 1251(a)(2), (9). Petitioners contend, however, that they are denied equal protection of the laws by being precluded from seeking suspension of deportation

---

* Honorable Scott Reed, United States District Judge for the Eastern District of Kentucky, sitting by designation.

pursuant to section 244(a)(1) of the Act, 8 U.S.C. § 1254(a)(1), and that their American-citizen children would suffer de facto deportation if the order is carried out. We disagree.

For the following reasons, we affirm the decision of the Board of Immigration Appeals.

## I.

Petitioners are both natives and citizens of the Republic of Ghana in West Africa. Dr. Alfred Newton entered the United States on August 24, 1973, and his wife entered on October 25, 1973, as a non-immigrant exchange visitor and exchange visitor's spouse, respectively, under section 101(a)(15)(J) of the Act, 8 U.S.C. § 1101(a)(15)(J). With extensions, their lawful sojourn in this country continued until September 30, 1979.

Dr. Newton, a graduate of a foreign medical school, took part in the exchange visitor program in order to complete postgraduate residency programs in pediatrics at schools in Massachusetts and Michigan. In 1974, he received a master's degree in public health from the University of Michigan. He has since become duly licensed to practice medicine in Michigan, and is a clinical instructor at the Wayne State University School of Medicine, a staff member at several Detroit-area hospitals, and the owner and operator of a small pediatric clinic, earning in excess of $40,000 per year.

Mrs. Newton worked as a seamstress at a Chrysler Corporation plant, sewing automobile cushion covers and earning approximately $8.00 an hour, from May 1976 until she was laid off in December 1980.[1] She attended college in her native land, and has taken college courses at Wayne County Community College with a view toward ultimately completing her education and obtaining a professional degree.

Dr. and Mrs. Newton have two children, now aged eight and a half and two and a half years, respectively, both of whom were born in this country and consequently are citizens of the United States. The Newtons are also purchasing a $49,000 home in Oak Park, Michigan, having made a down payment of $10,000. Dr. Newton's initial investment in the clinic totalled approximately $20,000.

Petitioners first came to the attention of the Immigration and Naturalization Service when Alfred voluntarily appeared at the Detroit INS office in November 1980, followed by his wife, Florita, in December of that year. The Service considered them deportable because they had both remained in the United States longer than authorized, and (in Dr. Newton's case) because he had ended his residency programs and was engaging in employment not authorized by the INS.

Pursuant to a "show cause" order, a hearing was held, on February 26, 1981, before an Immigration Judge in Detroit. At the hearing, Petitioners conceded that they were deportable under the Act, but wished to challenge certain provisions of the Act, as well as their deportation in particular, on constitutional grounds. The Immigration Judge maintained that he and the Board of Immigration Appeals have no authority to question the constitutionality of their governing statutes, but permitted Petitioners' counsel to put those arguments in a brief.

On May 7, 1981, the Immigration Judge filed a decision in which he found Petitioners to be deportable under the Act, according to evidence "that is clear, convincing and unequivocal." (App. at 4–6). He accordingly ordered Petitioners deported to Ghana (the country of their choice), but permitted them to depart from the United States voluntarily within 30 days. The Board of Immigration Appeals dismissed Petitioners' appeal on March 21, 1983, and affirmed the deportation order. Again, the Petitioners' constitutional issues were not addressed. Judicial review of the Board's

---

**1.** The record does not show whether Mrs. Newton has subsequently been employed at Chrysler or by any other employer.

decision in this Court is now sought pursuant to 8 U.S.C. § 1105a.

## II.

Petitioners first contend that, as exchange visitors admitted to the United States pursuant to 8 U.S.C. § 1101(a)(15)(J),[2] they are denied the opportunity to apply for suspension of deportation by the Attorney General, based on extreme hardship, although numerous other classes of non-immigrant aliens are permitted to do so.[3] Conceding that the Attorney General might not find the requisite hardship, and thus deny their request for suspension, they nevertheless insist that the fifth amendment guarantee of equal protection mandates treatment of exchange visitors on the same basis as other non-immigrant aliens.[4]

■ Despite this argument, Petitioners have failed to cite a single case which would require, or even persuade this Court to invalidate the statute in question. Congressional power to draw lines with respect to what classes of aliens will be admitted to the United States, and the conditions of such admission, is subject only to limited judicial review. *Fiallo v. Bell*, 430 U.S. 787, 794–96 & n. 6, 97 S.Ct. 1473, 1479–80 & n. 6, 52 L.Ed.2d 50 (1977). Moreover, the exercise of such power, if predicated on a rational basis, may distinguish between classes of aliens, and confer benefits on one or more classes that are not available to others. *See Mathews v. Diaz*, 426 U.S. 67, 81–84, 96 S.Ct. 1883, 1892–93, 48

---

**2.** The Act includes, among those classes of aliens excluded from immigrant status:

> an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program designated by the Secretary of State, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training and who, if he is coming to the United States to participate in a program under which he will receive graduate medical education or training, also meets the requirements of section 1182(j) of this title, and the alien spouse and minor children of any such alien if accompanying him or following to join him.

8 U.S.C. § 1101(a)(15)(J) (1982).

**3.** [T]he Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien ... who applies to the Attorney General for suspension of deportation and—

> (1) is deportable ... has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United

States or an alien lawfully admitted for permanent residence ....

8 U.S.C. § 1254(a)(1) (1982).

> The provisions of subsection (a) of [section 1254] shall not apply to an alien who—
>
> .    .    .    .    .
>
> (2) was admitted to the United States as a non-immigrant exchange alien as defined in section 1101(a)(15)(J) of this title ... in order to receive graduate medical education or training, regardless of whether or not the alien is subject to or has fulfilled the two-year foreign residence requirement of section 1182(e) of this title ....

*Id.* § 1254(f)(2).

**4.** The parties, in their briefs submitted to this Court, proceed on the assumption that section 1254(f) precludes *all* exchange visitors from applying for suspension of deportation by the Attorney General. However, the Immigration and Nationality Act Amendments of 1981, Pub.L. No. 97–116, § 9, 95 Stat. 1611, 1616 (codified at 8 U.S.C. § 1254(f)(3)) permit those exchange visitors, who were *not* admitted for the purpose of graduate medical education or training, to apply for such relief if they have satisfied, or have had waived, a requirement of two years' residence in the country of their nationality or last residence (see note 5 *infra*). Therefore, we are actually presented with two questions: (1) whether Congress could constitutionally bar all exchange visitors from seeking suspension of deportation, or at least burden them with a foreign residency requirement, when other non-immigrants are free to seek such relief; and (2) whether Congress could constitutionally distinguish between medical and non-medical exchange visitors by totally barring the former from eligibility for suspension of deportation.

L.Ed.2d 478 (1976) (reasonable for Congress to deny Part B Medicare benefits to aliens unless they are permanent residents who have resided in this country for at least five years).

The Newtons, however, argue that there is no rational basis for distinguishing between exchange visitor aliens and others who also enter the United States for a limited personal or business reason and also initially intend to return to their home countries. Citing to the Second Circuit decision in *Francis v. Immigration and Naturalization Service*, 532 F.2d 268 (2d Cir. 1976), they believe that denying exchange visitors the right to seek the discretionary relief available under section 1254(a)(1) subjects them to disparate treatment wholly unrelated to any legitimate governmental interest. According to the Petitioners, "the governmental interest concerning exchange visitors is that the program seeks to foster better international relationships by a mutual exchange of persons to study and to import knowledge and skills." (Petitioners' Brief at 8). In addition to distinguishing *Francis* on its facts, we see that this argument overlooks those legitimate interests which Congress may consider.

In *Francis*, the petitioner was convicted in a New York court for possession of marijuana. As a consequence, the INS instituted deportation proceedings against him under section 241(a)(11) of the Act, 8 U.S.C. § 1251(a)(11) (requiring the deportation of any alien "who at any time has been convicted of a violation of ... any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana"). When he sought discretionary relief under 8 U.S.C. § 1182(c), which permits the Attorney General, in his discretion, to readmit, after a temporary absence abroad, a permanent resident alien who has been convicted of such an offense, the Immigration Judge and the Board of Immigration Appeals held that such relief was not available to Francis since he was not being "excluded" from the United States after travel abroad, but was being deported. The court of appeals, on review, held the administrative interpretation of the statute to be unconstitutional since the Government "failed to suggest any reason why this petitioner's failure to travel abroad following his conviction should be a crucial factor in determining whether he may be permitted to remain in this country." 532 F.2d at 273.

■ This Court does not dispute the result in *Francis*, but finds that the exclusion of exchange visitors in general (and particularly those admitted for graduate medical education and training) from eligibility for suspension of deportation does not rest on "irrelevant and fortuitous factors." *Id.* Unlike some of the other groups of temporary visitors admitted to this country, exchange visitors have been permitted to come to the United States, and avail themselves of our educational and training facilities, not merely to benefit themselves or provide special expertise for American employers but rather to foster better relations between the United States and their native lands, and to bring the benefits of our learning back home to their countrymen.

In *Velasco v. Immigration and Naturalization Service*, 386 F.2d 283 (7th Cir. 1967), *cert. denied*, 393 U.S. 867, 89 S.Ct. 153, 21 L.Ed.2d 136 (1968), the court—in holding that the subsequent residence in Canada of two Filipino nurses who had been admitted to the United States as exchange visitors did not satisfy the two years of foreign residence required before permanent resident status could be obtained—made the following observations:

> By the amendments of 1961 (P.L. 87–256, 75 Stat. 535), Congress made it clear that the Exchange Program was not an immigration program and should not be used to circumvent the operation of the immigration laws.

> . . . . .

> It is apparent it was one of the purposes of the [Mutual Educational and Cultural Exchange Act of 1956], to admit certain citizens of foreign countries to the United States by special permission and for a limited period, to be trained in various skills and professions; that at

the conclusion of the training period, they should return to their native countries to practice their professions and skills, or to do so, in undeveloped countries. It would seem obvious Canada would not come under such a classification.

*Id.* at 286. Accordingly, it was a reasonable measure for Congress, in seeking to encourage compliance with the terms of the exchange visitors' admission to the United States, to foreclose any means by which those visitors could remain in this country permanently without having to return home first and put into practice the knowledge gained through the program.[5]

In addition, the legislative history of the 1981 amendments to the Act—which absolutely barred medical exchange visitors from applying for suspension of deportation[6]—expresses the specific rationale behind that action. In its report accompanying H.R. 4327, the House Judiciary Committee noted "the flagrant abuse of the exchange program during the past decade." H.R.Rep. No. 97–264, 97th Cong., 1st Sess. 16, *reprinted in* 1981 U.S.Code Cong. & Ad.News 2577, 2585. And the report's section-by-section analysis of the bill further explained the purpose of the amendment:

> *Section 9* amends section 244(f) of the Immigration and Nationality Act to permit certain exchange visitors not subject to a requirement of returning to their home countries (or who have satisfied the requirement or had it waived) to apply for suspension of deportation. It prohibits foreign medical graduates who have entered the United States as exchange visitors eligibility for application under this section notwithstanding a waiver of the two-year residence requirement. This amendment seeks to restrict the "brain drain" from certain countries of their finest doctors and promotes the objectives of the exchange program.

*Id.* at 25, *reprinted in* 1981 U.S.Code Cong. & Ad.News at 2594.

We believe Congress could reasonably conclude that well-educated and trained physicians are especially needed in countries around the world (and particularly in such impoverished nations as Petitioners' Ghana). Not permitting these foreign doctors to escape their obligation to return home and serve their people, even where they *could* satisfy or obtain waiver of the foreign residency requirement, is not based on any arbitrary or fortuitous distinction between these doctors and other exchange visitors, but rather on a desire to ensure that the exchange visitor program not become a means of lowering, rather than raising, the standard of medical care overseas. Just because Congress has not similarly tightened the loopholes through which other specialists can linger on and become permanent residents does not mean that *this* restriction is lacking in reason. As

---

5. Under section 212(e) of the Act, 8 U.S.C. § 1182(e), no exchange visitor who—

   (1) engaged in study or training financed wholly or partly by the U.S. Government or the government of the country of his nationality or last residence, or

   (2) was a national or resident of a country designated as "clearly requiring the services of persons engaged in the field of specialized knowledge or skill in which the alien was engaged," or

   (3) [at least with respect to those who came to the U.S. on or after January 19, 1977—8 C.F.R. § 212.7(c)(3) ] came to receive graduate medical education or training,

is eligible to apply for an immigrant visa or for permanent residence in the United States unless "such person has resided and been physically present in the country of his nationality or his last residence for an aggregate of at least two years following departure from the United States."

Although this foreign residency requirement can be waived under certain circumstances described in section 1182(e), the exchange visitor alien cannot have his status adjusted to that of permanent resident under section 245 of the Act, 8 U.S.C. § 1255, unless he "is eligible to receive an immigrant visa." Thus, he must both meet, or have waived, the foreign residency requirement *and* come within the quotas and other qualifications established for immigrant visas. On the other hand, to the extent that section 1254 would not bar the nonimmigrant from seeking suspension of deportation, and adjustment of his status under that section, he would only have to show "extreme hardship" in order to remain in the United States permanently.

6. See notes 3 and 4 *supra.*

stated by the Supreme Court nearly 30 years ago:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.

*Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) (citations omitted).

Under such a standard of rationality, it is not necessary for Congress to have drawn the line at the (purportedly) most reasonable point (i.e., barring all non-immigrant aliens, or at least all exchange visitors, from seeking relief under 8 U.S.C. § 1254(a)), but only that it had a rational purpose in drawing the line(s) as it did. That being so in this case, we must deny the first ground asserted by Petitioners for review of their deportation order.[7]

### III.

■ Petitioners also argue that their deportation from the United States would effect the de facto deportation of their children who are United States citizens. Thus, they contend, the rights of American citizens would be violated if the deportation order is affirmed.

Several courts, including this one, have addressed the issue, and the circuit courts which have done so have uniformly held to the contrary of Petitioners' position. *Ayala-Flores v. Immigration and Naturalization Service*, 662 F.2d 444 (6th Cir.1981) (per curiam); *Acosta v. Gaffney*, 558 F.2d 1153 (3d Cir.1977); *Gonzalez-Cuevas v. Immigration and Naturalization Service*,

515 F.2d 1222 (5th Cir.1975); *Encicso-Cardozo v. Immigration and Naturalization Service*, 504 F.2d 1252 (2d Cir.1974); *Mendez v. Major*, 340 F.2d 128 (8th Cir.1965). In *Mendez*, for example, the court was not persuaded by the contention of two Mexican nationals that requiring them to reside in Mexico for two years would violate their citizen son's constitutional rights: "There can be no doubt that Congress has the power to determine the conditions under which an alien may enter and remain in the United States ... even though the conditions may impose a certain amount of hardship upon an alien's wife or children." 340 F.2d at 131–32.

The Third Circuit's more recent analysis of the question in *Acosta* greatly elucidates the reasoning which supports such a conclusion:

> It is the fundamental right of an American citizen to reside wherever he wishes, whether in the United States or abroad, and to engage in the consequent travel. It is the right to exercise a choice of residence, not an obligation to remain in one's native country whether one so desires or not, as is required in some totalitarian countries. In the case of an infant below the age of discretion the right is purely theoretical, however, since the infant is incapable of exercising it. As the Court of Appeals for the Fifth Circuit pointed out in *Perdido v. Immigration and Naturalization Service*, 420 F.2d 1179, 1181 (5th Cir.1969), "... a minor child who is fortuitously born here due to his parents' decision to reside in this country, has not exercised a deliberate decision to make this country his home, and Congress did not give such a child the ability to confer immigration benefits on his parents.... It gave this privilege to those of our citizens who had themselves chosen to make this country their home and did not give the privilege to those minor children whose noncitizen parents make the real choice of family residence."

.    .    .    .    .

---

7. In light of this holding, we need not consider whether Petitioners should have applied for suspension of deportation, and been formally denied on grounds of their exchange visitor status, before seeking judicial review of this issue.

The right of an American citizen to fix and change his residence is a continuing one which he enjoys throughout his life. Thus while today Lina Acosta, as an infant twenty-two months of age, doubtless desires merely to be where she can enjoy the care and affection of her parents, whether in the United States or Columbia, she will as she grows older and reaches years of discretion be entitled to decide for herself where she wants to live and as an American citizen she may then, if she so chooses, return to the United States to live. Thus, her return to Columbia with her parents, if they decide to take her with them as doubtless they will, will merely postpone, but not bar, her residence in the United States if she should ultimately choose to live here.

558 F.2d 1157–58 (citations omitted). Here, Petitioners' children, who are only of kindergarten and grammar school age, have not reached the "years of discretion" necessary for them to choose their country of residence. But regardless of their parents' fate, the Newton children will remain American citizens who have the right to return to this country at any time of their liking.

We should note, as well, that the deportation order against Dr. and Mrs. Newton does not compel them to take the children with them. It appears in the record that Florita Newton has a sister, residing in Grosse Pointe, Michigan, who is a permanent resident of the United States. So if the parents consider it more important for their children to grow up in America and attend American schools, they could conceivably make arrangements for the children to stay in Michigan with their aunt. Thus we find no constitutional rights of citizenship implicated in the decision to deport Alfred and Florita Newton. "Were we to hold otherwise, we would create a substantial loophole in the immigration laws, allowing all deportable aliens to remain in this country if they bear children here." *Ayala-Flores*, 662 F.2d at 446.[8]

### IV.

Accordingly, the decision of the Board of Immigration Appeals, affirming the order for the deportation of Petitioners to the Republic of Ghana, is hereby AFFIRMED. The Petitioners should be allowed to depart voluntarily within thirty (30) days after entry of the judgment of affirmance.

---

**8.** Our resolution of the issues presented by Petitioners should not be taken as evidencing any lack of sympathy for their plight. Indeed, were it not for the fact that Dr. Newton has twice failed the Visa Qualifying Examination (parts I and II of the National Board of Medical Examiners Examination or their equivalent) required, under 8 U.S.C. § 1182(a)(32), for him to be eligible for an immigrant visa, we might have remanded the case for a determination of whether the Newtons could obtain a waiver of the foreign residency requirement based on the exceptional hardship Petitioners' deportation might visit upon their American-born children. *See* 8 U.S.C. § 1182(e) (1982). But such a waiver would not, until such time as Dr. Newton passes said examination, enable Petitioners (or at least Alfred Newton) to apply for adjustment of status to permanent residency under 8 U.S.C. § 1255 (see note 5 *supra*).

Any further efforts to forestall deportation, or change the Newtons' immigration status, are clearly in their hands, and those of their attorney. This Court, however sympathetic, can only render judgment according to the law and the facts before us.