IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

—————————

No. 01-60329

—————————

CROSBY MEMORIAL HOSPITAL,

Plaintiff-Appellee,

versus

HALA MOHAMMED ABDALLAH, MD,

Defendant-Appellant.

—————————

Appeal from the United States District Court
for the Southern District of Mississippi
(97-CV-635)

—————————

August 13, 2002

Before KING, Chief Judge, and GARWOOD and HIGGINBOTHAM, Circuit
Judges.

PER CURIAM:[*]

Dr. Hala Mohammed Abdallah ("Abdallah") appeals the district

court's grant of summary judgment to Crosby Memorial Hospital

---

[*]Pursuant to 5TH CIR. R.47.5 the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

("Crosby") on its breach of contract complaint and against her on her counterclaims for breach of contract, fraud in the inducement, breach of the duty of good faith and fair dealing, and tortious interference with contract and prospective business relations. Because Abdallah produced enough evidence to survive summary judgment on the issue of Crosby's promises to help her get a green card, we reverse the grant of summary judgment on her counterclaim for fraudulent inducement. Because this fraud may also serve as a defense to breach of contract, we reverse the summary judgment granted on Crosby's breach of contract action. We affirm the summary judgment, however, as to all other arguments raised by Abdallah. Finally, we reject Abdallah's appeal of the district court's order striking the legal conclusions in the affidavit of her expert witness.

**Background**

Dr. Hala Mohammed Abdallah, a citizen of Jordan, came to the United States in 1987. After she completed a residency in pediatrics, she was contacted by Glenn Lowery, an administrator with Crosby Memorial Hospital in Picayune, Mississippi who was attempting to recruit a pediatrician to that relatively rural area. When Abdallah met Lowery, he explained that Picayune was in a designated health care professional shortage area, which suggested that practicing medicine there would allow Abdallah to receive a waiver of the two-year foreign residency requirement otherwise

2

applicable to graduate medical students in the United States under a J-1 visa.  Lowery added that he would help Abdallah obtain her green card and told her he had similarly helped other physicians in the past.

On July 28, 1994, Abdallah and Crosby Memorial Hospital entered into a contract titled a "Net Income Guarantee Agreement." Under the terms of the contract, Crosby would guarantee Abdallah a salary of $140,000 a year for two years by loaning her a subsidy equal to the difference between that amount and her "net practice income." "Net practice income" was defined in the contract as gross collections minus reasonable professional expenses; "reasonable professional expenses" was defined with reference to the IRS guidelines and a non-exclusive list of permissible expenses.  The definition of "reasonable professional expenses" then specified that notwithstanding the above rule, any money expended as purchase price, rental or lease on depreciable property would be disallowed as a "reasonable expense" to the extent it exceeded $10,000 annually.  The contract then specified that this loan of income assistance would be forgiven if Abdallah continued to practice full-time for an additional two years.  If she didn't, she would have to repay the subsidy over twelve months.  Moreover, Abdallah would have only three months to repay under certain enumerated circumstances, one of which was if her "medical staff privileges at hospital [were] terminated in accordance with the hospital's

3

medical staff bylaws." In contrast, Abdallah could only terminate the contract if Crosby violated its duties to pay subsidy.

In addition to this income subsidy loan, the contract provided that the hospital would "reasonably" assist Abdallah in setting up her office, hiring personnel, setting up accounting records, and marketing her practice, though the contract reiterated that the "primary" responsibility for the practice remained on Abdallah. Another section of the contract specified that Abdallah was to be considered an "independent contractor" with her own unfettered judgment concerning the care of her patients. Similarly, the contract notes that Abdallah was not obligated to admit her patients to Crosby. Finally, the contract explicitly states that it is the entire agreement between Abdallah and the hospital, and that it supersedes any other oral or written agreements.

After signing the agreement, Abdallah and her family moved to Picayune where they purchased a home, rented a temporary office, and built an office facility for her clinic. When she began practicing full-time in Picayune, Abdallah's practice operated at a net practice loss, requiring substantial subsidy payments. She alleges the hospital did not assist her as required by the contract even though she submitted the required monthly accounting reports. In light of her difficulties, Abdallah bristled that the hospital continued to attempt to recruit doctors to the area. Abdallah also discovered that although there was only one other pediatrician in

4

town, she faced competition from family practitioners who did some pediatrics. Moreover, Abdallah's pursuit of a green card also failed. During 1995, Lowery wrote letters and contacted government officials in an apparent attempt to assist Abdallah with her application for permanent resident status. These attempts were unavailing because Abdallah could only receive a waiver of the foreign residency requirement if she were directly employed by a hospital under a three-year contract, and Crosby declined to alter the Net Income Guarantee Agreement.

In June 1996, Crosby hired the Horne CPA Group to examine Abdallah's records and expenses under the Net Income Guarantee Agreement. The CPA examined the clinic's records and practices and reported that the hospital had overpaid Abdallah by $63,795.73 due to "understated cash receipts and overstated operating expenses." The CPA acknowledged his report could not meet generally accepted auditing standards and advised a total reconstruction of Abdallah's accounting records and receivables. Upon receiving this report, Lowery wrote a letter to Abdallah detailing Crosby's concerns and asking for her cooperation in achieving the recommended audit. Crosby then suspended the remaining two-and-a-half months of income subsidy payments until this accounting was completed.

An independent audit by Abdallah's financial expert, Northshore Financial Services, ultimately determined that Abdallah had been underpaid by $47,510.13. In arriving at this number, the

5

analyst deducted all business expenses allowed by the IRS without applying the $10,000 cap on expenditures on depreciable assets contained in the contract. Abdallah demanded the withheld subsidies and a per-hour salary for the time she had spent on call at the hospital, but Lowery refused to pay the subsidies or release her from the on-call requirements in the contract. On March 6, 1997, Abdallah wrote the Chief of Staff at Crosby announcing her resignation from staff privileges at Crosby. Because a termination of staff privileges was one of the enumerated circumstances in Article V permitting Crosby to terminate the contract, Crosby did just that and demanded full repayment of the subsidy.

On August 27, 1997, Crosby filed suit in Mississippi state court against Abdallah alleging that she had breached the Net Income Operating Agreement. Abdallah timely removed to federal court and counterclaimed for breach of contract, fraud, misrepresentation, breach of the duty of good faith and fair dealing, tortious interference with contract, and tortious interference with prospective business relations. During discovery, the District Court entered an agreed order appointing an independent accounting firm to audit Abdallah's records. This CPA, Kenneth Lefoldt, made minor adjustments to the audit provided by Abdallah's accountants, applied the $10,000 cap on depreciable property, and concluded that Abdallah was overpaid by $53,525.80.

Crosby moved for summary judgment on its breach of contract

6

claim, and soon thereafter moved for summary judgment on Abdallah's counterclaims. After Abdallah filed her responses, Crosby moved to strike the affidavit of Abdallah's expert, Paul A. Harris, on the grounds that it introduced parol evidence regarding an unambiguous contract and violated Rule 702 and 704 because it expressed a legal conclusion. On June 24, 1999, the district court struck those portions of Harris's affidavit that were legal conclusions. The same day, the district court granted summary judgment to Crosby on all points, dismissed the case with prejudice and ordered Abdallah to pay all amounts required by the contract including the subsidy payments and Crosby's attorneys' fees. On March 26, 2001, the district court entered an order setting the total amount as $352,041.95. The present appeal followed.

**Discussion**

## I. Breach of Contract

The majority of the parties' arguments in this case concern the breach of the Net Income Guarantee Agreement. Crosby argues that Abdallah breached the agreement by resigning her staff privileges at the hospital and moving her practice to Slidell, Louisiana. Under the agreement, this would definitely be a breach of contract. Article V of the contract lists circumstances under which Crosby could terminate the contract; one of these circumstances was if Abdallah's medical staff privileges at Crosby were terminated in accordance with the Hospital's medical staff

7

bylaws.  Abdallah submitted a resignation of her staff privileges, and she does not dispute that Crosby's termination of her privileges was done according to the bylaws.  Thus, under Article V Abdallah is "required to repay Hospital within three (3) months the sum of all subsidy advances . . . ."  Crosby was entitled to repayment of the subsidies it had paid, and Article XI gives it the right to recoup its attorneys' fees in an enforcement action.

Abdallah makes numerous arguments as to why she did not breach the contract, which we shall address in turn.  This court reviews both grants of summary judgment *de novo*, reviewing all evidence in the light most favorable to non-movant Abdallah.  *Lee v. E I Dupont De Nemours & Co.*, 249 F.3d 362, 364 (5th Cir. 2001).  In doing so, this court looks to the substantive law of Mississippi. *Id.*  The district court's interpretation of a contract is a question of law this court should review *de novo*. *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 458 (5th Cir. 1995).  The same is true for the district court's decision whether the contract is ambiguous. *Id.*  If the contract is determined to be ambiguous, however, the intent of the parties is a question of fact. *Id.*

A.  *Ambiguity of the Contract*

Abdallah claims that the contract language is ambiguous, and that under Mississippi law an ambiguous contract should be submitted to a jury for interpretation.  We generally agree with this statement of Mississippi law, *see Pursue Energy Corp. v.*

8

*Perkins*, 558 So. 2d 349 (Miss. 1990), but we conclude that the contract is not ambiguous.

### 1. The Subsidy Provisions Are Clear

Abdallah first argues that the contract is ambiguous because the Agreement's formula for calculating the subsidy is unclear. She argues that key terms like "net practice income" and "reasonable professional expenses" are not adequately defined and further claims that the contract's reference to the "technical" IRS regulations renders the contract unclear. She also suggests that because the three auditors arrived at different conclusions, the rules for calculating the subsidy must be ambiguous. We disagree with Abdallah on all points. The contract describes the meaning of its key terms in painstaking detail. The fact that those definitions are rendered with reference to the IRS regulations does not introduce ambiguity; the complexity of the IRS regulations increases the clarity of the contract by providing a wealth of guidelines and examples for the parties to rely upon.

We also disagree that the fact that three auditors each came to different results reflects poorly on the clarity of the contract. Abdallah has not provided evidence that the variance between the audits can be attributed to ambiguity in the text rather than variances in the reconstruction of her recordkeeping. She claims the experts disagree over the meaning of the contract because they dispute whether "rent" was a permissible expense. Her

9

argument fails because the contract is simply not ambiguous on this point. The contract very clearly allows rent as a "reasonable business expense," but just as clearly limits Crosby's liability for rent on depreciable property to $10,000 per year. Abdallah has not explained why the office building she rents to herself is not "property wherein depreciation is allowable under I.R.S. Code Section 167."

### 2. There Is No Conflict Between Articles V and VIII

Abdallah next purports to find ambiguity in the alleged conflict between her Article V obligation to maintain staff privileges at Crosby and her Article VIII power to admit her patients at other hospitals. We find no conflict between these provisions. The freedom to admit patients to other hospitals coexists well with the contract's limited requirement that Abdallah maintain the *option* to admit patients at Crosby. This argument fails as well.

### 3. There Is No Conflict Between Articles IV and V

Abdallah then claims that the contract is ambiguous because Article V only allows her to terminate the contract if Crosby violates Article I, II or III. Article IV, the article concerning Crosby's duty to assist Abdallah in establishing her practice, is not listed as a reason for Abdallah to terminate the contract. Abdallah believes this raises questions about the meaning of Article IV that amount to ambiguity. We disagree. A violation of

Article IV is still a breach of contract, even though Article V prevents Abdallah from rescinding the contract as a remedy for that breach. *See J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co., Inc.*, 683 So. 2d 396, 403 (Miss. 1996) (distinguishing breach of contract, which confers the right to sue for damages, from a material breach conferring the right to terminate). Article IV has meaning and purpose, and thus the careful choice to omit Article IV from Article V introduces no ambiguity into the contract.

> *4.    Abdallah's Move to Slidell Was Not Briefed And Is Moot*

Abdallah's final argument concerning ambiguity relates to the requirement that she remain in practice for an additional twenty-four months to receive the loan forgiveness promised in Article II. The "Witnesseth" and "Statement of Fact and Intent" portions of the contract contain references to Pearl River County and the "surrounding communities" in the "Hospital's service area," but those sections make clear the parties contemplated that Abdallah would establish and maintain her practice in Pearl River County, Mississippi. Similarly, Article I ("Moving Expenses") and Appendix A ("Relocation Assistance") state that Abdallah will continue her practice in Picayune, Mississippi for the additional two year term or she will become obligated to repay those sums within three months.

The alleged ambiguity arises from the language of Article II, which requires Abdallah to remain in practice for another two years

11

to receive forgiveness of her loaned subsidies.  Article II only speaks of "leav[ing] or ceas[ing] full time practice" and does not specify where that practice must take place.  Abdallah argues that because she moved to Slidell, Louisiana and continued to practice there full time, and because Slidell is in the same general area as Pearl River County,[1] she arguably did not violate Article II such that she was required to repay the subsidy.  Abdallah testified in her deposition that she thought she would be able to continue her practice in Slidell and still serve her patients in Picayune.  Crosby rebuts her argument by claiming Abdallah confessed in her deposition that her choice to move away from Picayune obligated her to repay the subsidy, but that is an incorrect reading of the whole of Abdallah's deposition testimony.

We might be inclined to give weight to Abdallah's argument except for two countervailing considerations.  First, Abdallah failed to brief this argument on appeal and she did not even raise this argument in her summary judgment memorandum before the district court.  Arguments not briefed before this court are waived except in extraordinary circumstances.  *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001); FED. R. APP. P. 28(a)(9)(A).  Second, Abdallah breached the contract when she

---

[1] Slidell is about twenty-five miles away from Picayune. According to Abdallah, the nearest hospital to Picayune (Crosby excepted) is in Slidell and is about thirty minutes' drive away.

resigned her staff privileges and thereby became obligated to repay the loaned subsidies within three months. It is therefore moot whether she also became obligated to repay the subsidies because she moved to Slidell. Though it is difficult to say whether the language of Article II contains more than a scintilla of ambiguity, we find no reason to answer that difficult question when the argument is improperly presented and moot.

We find no ambiguity in the contract and affirm the grant of summary judgment as to each of those challenges.

*B. Breach of the Contract by Crosby*

Abdallah also argues that she did not breach the Net Income Guarantee Agreement because it had been previously breached by Crosby. She has two separate arguments for why Crosby breached the agreement before she did.

*1. Failure to Assist In Establishing Her Practice*

Abdallah claims that Crosby failed to meet its contractual duties under Article IV of the Net Income Guarantee Agreement, which obligates Crosby "reasonably to assist Physician in organizing/setting up Physician's office, ordering supplies, hiring personnel, setting up accounting records, and marketing/promoting Physician's practice." Article IV adds that it "does not absolve Physician of primary responsibility for the set-up of Physician's practice." Abdallah claims that Crosby's failure to assist her constitutes a material breach of the contract. A material element

13

of the contract is one that is "vital to the existence of the contract" or "essential." *J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co., Inc.*, 683 So. 2d 396, 403 (Miss. 1996). A material breach of the contract by Crosby could allow the termination of the contract under Mississippi law. *UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc.*, 525 So. 2d 746, 756 (Miss. 1987).

Crosby claims that Abdallah provided no summary judgment evidence whatsoever supporting her assertion that Crosby failed to assist her as required by Article IV. This assertion appears to be correct. Abdallah's response to the motion for summary judgment refers the district court to the deposition testimony of Calvin Green, but Green clearly testified that he had no knowledge of the issue. Abdallah does not direct us to any other source of evidence, either in her briefs or in her otherwise well-cited memorandum in support of her response to the motion for summary judgment. We can find no evidence either. Abdallah does not testify in her deposition that Crosby failed to assist her. The affidavit of Abdallah's expert Paul A. Harris mentions in passing that Crosby "ignored" her and demonstrated a "lack of effort," but nothing indicates that these assertions were or could have been made on his personal knowledge and thus cannot suffice as summary judgment evidence. *See* FED. R. CIV. P. 56(c). Once Crosby presented its case for summary judgment, Rule 56(e) prevented Abdallah from resting on her pleadings and required her to

14

introduce evidence supporting her allegations. *See* FED. R. CIV. P. 56(e); WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 2721 (1998). Abdallah failed to introduce any evidence to support her allegations, not even a verified pleading. Summary judgment is proper.

Moreover, Crosby's alleged breach of Article IV could not have been a "material" breach justifying Abdallah's refusal to perform under the contract. As we have already discussed, Article V of the Net Income Guarantee Agreement notoriously failed to list Article IV as one of the provisions entitling Abdallah to terminate the contract in case of breach. Article IV cannot be considered "vital" or "essential" if it was so limited; indeed, the limitation in Article V seems to make Article IV the very antonym of "material" as defined in the case law. What's more, Article IV reiterates that the "primary" responsibility for establishing her practice remained on Abdallah. It would normally be difficult to imagine what failings would constitute a "material" breach under these circumstances, and it is impossible to imagine in this case because Abdallah has provided no evidence. We therefore affirm the grant of summary judgment on this issue.[2]

### 2. Crosby's Termination of Subsidy Payments

Abdallah also claims that Crosby breached the Net Income

---

[2] As this is not a case concerning the sale of goods under the U.C.C., we will not consider Crosby's argument regarding the right to cure.

15

Guarantee Agreement when it refused to pay her subsidies for the last two and a half months of the contract. Crosby's refusal was spurred by the report from the Horne CPA Group stating that Abdallah's records were in disarray, that Abdallah had been overpaid by tens of thousands of dollars, and that a complete reconstruction of her records would be necessary. Abdallah argues that payment of subsidy was calculated on a monthly basis, and because the $140,000 annual income guarantee was based on *net* practice income Crosby should not have withheld the remaining subsidy payments. That is, because Abdallah might have earned less than $11,666 in each of the remaining months, Crosby may still have been obligated to pay subsidy to bring her income up to a total of $140,000 for that year. Abdallah claims Crosby was not entitled to withhold subsidies if those future amounts remained undetermined.

The contract calculates the subsidy due by subtracting the monthly net practice income from $11,666; this payment was conditioned on Abdallah's delivery of a report containing various accounting records including net practice income or loss. At the point when Abdallah claims she was entitled to her subsidy payment, Crosby had received an expert report explaining that her accounting lacked the necessary rigor and veracity and that as a result of Abdallah's errors she had overstated her net practice loss by over $63,000. In order to be entitled to any subsidy check at all, therefore, Abdallah would have to provide a report that "swallowed

16

up" that overpayment through a net practice loss of more than $63,000 since the date of that expert report. Alternately, she could produce a report correctly accounting for the previous year and explaining why any remaining overpayment was less than her net practice loss. There is no evidence that Abdallah provided either. Provision of the report was a condition precedent to the subsidy payment, and therefore we find it was not a breach of contract for Crosby to withhold payment. We affirm the grant of summary judgment on this point.

Abdallah also argues that Crosby's withholding of the subsidy payment is an attempt to profit from its own breach in violation of the principle set forth in *UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, Inc.*, 525 So. 2d 746 (Miss. 1987). In that case, a hospital sued its management company because it revised the hospital budget and raised rates even though the hospital had the exclusive power to take that step. *Id*. at 755. The court held that because the hospital could change the rates itself instantly and undo the misdeed, the management company's breach could not be material. *Id*. at 756. Moreover, the court noted a party must avoid damage if possible rather than choosing to suffer the damage and pass the cost along to the other party. *Id*.

Abdallah claims that Crosby could have prevented the very problem of which it complained if only it had honored its agreement to assist her in setting up her practice, and therefore *UHS-*

17

*Qualicare* prevents Crosby from suing her for breach of contract. There are two problems with this assertion. First, as discussed above Abdallah introduced no evidence that Crosby failed to fulfill its duties to help her set up her practice. Second, *UHS-Qualicare* concerns the highly unusual circumstance where a party can completely and effortlessly undo the other party's breach after the fact, while Crosby's ability to establish and oversee Abdallah's accounting could not provide the same complete, after-the-fact cure. We therefore reject Abdallah's argument and affirm the summary judgment on this issue.

## II.  Fraud In The Inducement

Abdallah asserts that the district court erred in granting summary judgment on her counterclaim of fraud in the inducement. She also asserts that the same fraudulent inducement claim should have prevented the district court from granting summary judgment on Crosby's breach of contract claim.

Under Mississippi case law, "[a] claim of fraud must satisfy nine elements: 1) a representation, 2) that is false, 3) that is material, 4) the speaker's knowledge of its falsity or ignorance of its truth, 5) the speaker's intent that the hearer act upon it in the manner reasonably contemplated, 6) the hearer's ignorance of its falsity, 7) her reliance on its truth, 8) her right to rely thereon, and 9) her consequent and proximate injury." *American Income Life Ins. Co. v. Hollins*, ___ So.2d ___, 2001 WL 695516 at

18

*6 (Miss. Jun. 21, 2001). The same elements apply both to fraud generally and fraudulent inducement specifically. *See id.* Though Mississippi law requires that each of the elements of fraud be ultimately proven by clear and convincing evidence, *id.*, summary judgment should be denied if there are disputed facts that are material to the fraud determination. *See Simmons v. Thompson Machinery of Mississippi, Inc.*, 631 So.2d 798, 802 (Miss. 1994). We will similarly apply the federal standards for summary judgment to this Mississippi case.

Abdallah's claims of fraudulent inducement arise from two groups of representations made by Glenn Lowery while the parties were in contract discussions, which we will address in turn.

*A. Green Card*

In her deposition, Abdallah testified that Lowery promised he would help her obtain a green card and told her that he had done so for other physicians in the past. According to Abdallah, Lowery specifically noted that Crosby was in a health care professional shortage area, arguably implying that this fact was relevant to her ability to obtain a green card through working for Crosby. The record also contains a letter from Lowery to Secretary of Agriculture Dan Glickman asking the Department to help Abdallah by assuming the role of an "interested United States Government agency" based on the agricultural nature of the Picayune area. The letter refers Secretary Glickman to sections 10(a)(15)(j) and

19

212(e) of the Immigration and Naturalization Act, codified at 8 U.S.C. § 1101(a)(15)(J) and § 1182(e), which contain the limitations on the ability to grant such a waiver.

Abdallah argues that Lowery made his promise to "help" her get a green card in order to fraudulently induce her to sign the Net Income Guarantee Agreement, and she claims that his letter-writing efforts were no "help" at all. As discussed below, we agree that Abdallah introduced sufficient evidence to defend this assertion against a motion for summary judgment. While Crosby relies on the merger clause in the Net Income Guarantee Agreement, that clause cannot prevent Abdallah from asserting her claim of fraudulent inducement. We address this latter point first.

### 1. The Merger Clause

Crosby primarily defended against the fraud allegations by relying on the merger clause in the Net Income Agreement. This clause, Article XVI, states that the contract is the "entire understanding" between the parties and that it supersedes any other agreements, whether oral or in writing. Because Abdallah read and understood this provision, Crosby argues, she could not have reasonably relied on any oral statements made outside the four corners of that contract. The district court apparently agreed. *See* Memorandum Opinion at 4, 8.

Our reading of Mississippi case law does not comport with Crosby's assertion, however. In *Brown v. Ohman*, 42 So. 2d 209

20

(Miss. 1949), the Mississippi Supreme Court considered a contract for land challenged on the ground that the seller had fraudulently induced the buyer; the land had far less merchantable timber on it than the seller had claimed. *Id*. at 210. Despite the fact that the contract stated that both parties were relying on their own estimate of the value of the property, the court affirmed the decree ordering the seller to reimburse the buyer. *Id*. at 211. The court held that contract recitals of "no reliance" were to be ignored in cases of fraud and deceit, because the alleged fraud and deceit may have induced the party to sign the contract containing the recital. *Id*. at 213. The court added that clauses stating that the contract contains "all the terms involved and the representations made" should be similarly ignored when fraud is alleged. *Id*. Fraud cannot merge with a contract and thus completely negates it. *Id*. at 212.

This holding seems directly on point. Abdallah's claims of fraudulent inducement should survive a "merger clause" like Article XVI because that fraud may have induced her to sign the contract, merger clause and all. Though *Brown* is an older case, we note that the Mississippi Supreme Court reaffirmed this point of law only last year, albeit in *dictum*. *See Turner v. Terry*, 799 So. 2d 25, 34 (Miss. 2001). We therefore hold that Article XVI of the Net Income Agreement does not prevent Abdallah from introducing parol evidence of Lowery's alleged fraudulent statements and does not

21

negate the element of reliance in the alleged fraudulent inducement. We next ask whether Abdallah introduced enough evidence to survive summary judgment on this issue.

### 2. Sufficiency of the Evidence

In order to understand whether Abdallah introduced sufficient evidence that Lowery fraudulently induced her to sign the contract, it is necessary to first carefully examine the immigration laws applicable to her. Abdallah's J-1 visa was granted for the purpose of allowing her to pursue her graduate medical education. This places her generally within the group of "immigrants" defined in 8 U.S.C. § 1101(a)(15)(J) and particularly within the limitations of 8 U.S.C. § 1182. Section 1182(e) prevents such immigrants from being eligible for change to a more favorable immigration status until they have returned to their home country and resided there for two years.[3]

The Attorney General may waive this requirement, however, when the Director of the United States Information Agency recommends

---

[3] This requirement enforces the purpose of the exchange program: to foster relations with foreign countries by allowing their citizens to be trained in the United States and then return to apply the fruits of their study in their native land. *See Newton v. INS*, 736 F.2d 336, 340-41 (6th Cir. 1984). The requirement also remedies the "flagrant abuse" of the study program and likewise prevents the "brain drain" suffered by many countries whose citizens received training in the United States and then declined to return. *See id*. at 341, *quoting* 1981 U.S. Code Cong. & Ad. News 2577, 2594.

22

it.[4]  *See* 8 U.S.C. § 1182(e).  The power to recommend waiver is strictly limited; the Director may recommend waiver when the Commissioner of Immigration and Naturalization requests it pursuant to a determination that such a return would impose an exceptional hardship on the immigrant's family or would expose the immigrant to persecution on account of race, religion or political opinion.  *See id.*  The Director may also recommend waiver of the two-year foreign residence requirement on the request of "an interested United States Government agency" or (in the case of graduate medical students) "a State Department of Public Health."  *See id.*  For most cases, the Attorney General may grant a recommended waiver if he determines it to be "in the public interest."  In contrast, the Attorney General is strictly forbidden to grant a waiver to a graduate medical student unless she has met the requirements of 8 U.S.C. § 1184(l).[5]  *Id.*

---

[4]  Now that the United States Information Agency has been integrated into the United States Department of State, waiver review is conducted by the Waiver Review Division of the Office of Legislation, Regulation and Advisory Assistance in the Visa Office of the Bureau of Consular Affairs.  *See* http://travel.state.gov/waiverpa.html.

[5]  The text of the statute refers to 8 U.S.C. § 1184(k).  *See* 8 U.S.C. § 1182(e).  This citation was correct when the law was passed.  *See* Immigration and Nationality Technical Corrections Act of 1994, Pub. L. No. 103-416, § 220, 108 Stat. 4305 (1994) (creating this requirement in section 1182(e) and a new subsection of section 1184 denominated "k").  Section 1184(k) was modified and redesignated "1184(l)" in the Omnibus Consolidated Appropriations Act of 1997, Pub. L. 104-208, §§ 622(a) and 671(a)(3)(A), 110 Stat. 3009 (1996).  The same statute added a new subsection, which was accidentally designated "l" as well.  *See id.*

For a graduate medical student to meet the requirements of section 1184(l), she must demonstrate a bona fide offer of full-time employment at a health facility or health care organization. 8 U.S.C. § 1184(l)(1)(C)(i). She must agree to begin work within ninety days and continue to work for not less than three years. *Id*. at § 1184(l)(1)(C)(ii). If the position is not for medical research or training, the immigrant must also agree that this practice shall be in a geographic area designated by the Secretary of Health and Human Services as having a shortage of health care professionals. *Id*. at § 1184(l)(1)(D).[6] Violation of these terms, including failure to fulfill the contract, will immediately cause the two-year foreign residence requirement to apply again. *Id*. at § 1184(l)(3).

This examination of the relevant immigration law clarifies the import of Lowery's actions. We must make all reasonable inferences in Abdallah's favor, and in doing so we find she has presented evidence on each of the nine elements of her claim of fraud in the inducement. (1) As for the first element -- a "representation" -- Lowery promised future conduct that he had no power to actually

_____

at § 625(a)(1). Congress has not corrected this dual subsection problem, nor has it altered the text of section 1182(e) to reflect the renaming of section 1184(k). Nevertheless, it is obvious that the subsection titled "Restrictions on Waiver" is the one that limits the ability of graduate medical students to receive a waiver of the two-year foreign residency requirement.

[6] The procedure by which the Department of Health and Human Services makes this determination is contained at 42 C.F.R. Part 5.

perform.  Lowery asserted that he had helped other physicians get a green card, he referred to section 1184(l)'s specific requirement that the hospital be located in a designated health care professional shortage area, and he wrote a letter to the Secretary of Agriculture specifically pointing the Secretary to the statutes limiting Abdallah's ability to get a green card.[7]  These facts all suggest that Lowery understood the requirements of sections 1182(e) and 1184(l).  If he understood those sections, he knew that he could do nothing to move Abdallah closer to her goal of a green card.  He thus would have no present intent to deliver when he made his promise to help, and this state of mind suffices to make a promise of future conduct a "representation" for purposes of fraud. *See R.C. Const. Co. v. Nat'l Office Systems, Inc.*, 622 So. 2d 1253, 1256 (Miss. 1993) (quoting *Bank of Shaw v. Posey*, 573 So. 2d 1355, 1360 (Miss. 1990)).

Continuing with the elements of fraud, (2) according to Abdallah's deposition testimony, the representation was material to her decision.  (3) The representation was demonstrably false,

---

[7]More precisely, perhaps, Abdallah's deposition testimony, in light of the present record, permits a fact finder to reasonably conclude that a reasonable person in her situation would understand Lowery's statements to her as relating that if she accepted the Crosby offer she would be eligible to receive a green card and that a reasonable person in Lowery's position would understand that Abdallah would likely so understand what he was saying to her.

Whether the evidence in fact introduced at any future trial (where Abdallah's testimony might differ somewhat from her deposition and where additional evidence of an uncontradicted character might also cast a different light on the matter) will suffice to sustain a verdict for Abdallah on her fraud claim, we do not address.

because Lowery had no power to help her unless he radically altered the contract. (4) As discussed above, there is some evidence that Lowery knew the statutory requirements for waiver of the foreign residency requirement and thus knew he was completely powerless to help Abdallah. This suffices to establish, for summary judgment purposes, that he knew his promise was false. (5) Lowery was trying to recruit Abdallah, and thus he intended that she rely on his statements. (6) Abdallah testified that she had no knowledge that his promise was false and that (7) she relied on Lowery's promise. (8) She also testified that she passed up other job opportunities, which constituted a consequent and proximate injury.

Finally, (9) there is some evidence that Abdallah had the right to rely on the promise. We recognize that she is a highly educated person with some ability to investigate Lowery's claims for herself, and this weighs in the "right to rely" consideration. *See Martin v. Winfield*, 455 So. 2d 762, 765-66 (Miss. 1984) (the fact that the deceived party was an attorney who could have easily confirmed the truth of the assertion supported a jury verdict in his opponent's favor); *but see* RESTATEMENT (SECOND) OF TORTS § 540 (1976) (no duty to investigate the truth of a representation if not known to be false). On the other hand, Abdallah is an alien with no knowledge of immigration law while Lowery is a U.S. citizen who has recruited foreign physicians and who plausibly represented that he had experience with immigration. This apparent imbalance of

26

knowledge favors Abdallah's "right to rely," at least at the summary judgment stage. *See Martin*, 455 So. 2d at 765-66; *American Income Life Ins. Co. v. Hollins*, ___ So.2d ___, 2001 WL 695516 at *6 (Miss. Jun. 21, 2001); *Allen v. Mac Tools, Inc.*, 671 So. 2d 636, 642-43 (Miss. 1996); *Turner v. Wakefield*, 481 So. 2d 846, 849-850 (Miss. 1985). Abdallah has provided some evidence on each element of her claim.

This examination of immigration law also belies Crosby's claim that Lowery actually "helped" Abdallah and thus held up his end of their bargain. The Net Income Guarantee Agreement neither provided Abdallah with true employment nor required her to practice with Crosby Memorial Hospital for three years, and therefore 8 U.S.C. § 1182(e) forbade the Attorney General from granting a waiver under any circumstances. The Department of Agriculture and the Mississippi Department of Health were utterly powerless to help Abdallah, and Lowery's letters to these agencies were a waste of postage. The only thing Lowery could have done to "help" was agree to transmute the Net Income Operating Agreement into a three-year direct employment contract, which he refused to do. Crosby has failed to produce evidence negating Abdallah's counterclaim.

Abdallah's counterclaim for fraudulent inducement is not barred by Article XVI of the Net Income Operating Agreement, and she has provided more than a scintilla of evidence on each element of her claim. The district court thus erred in granting summary

27

judgment against her on the counterclaim for fraud in the inducement. Moreover, while Abdallah did not expressly raise the affirmative defense of fraud in her answer to Crosby's lawsuit, a counterclaim for fraudulent inducement should suffice to raise a defense of fraud in a breach of contract suit at least so as to prevent a summary judgment in the present circumstances where these matters were all considered together. *See Turner v. Terry*, 799 So. 2d 25, 34 (Miss. 2001). If proven, fraud completely negates a contract. *Brown*, 42 So. 2d at 212. The district court therefore erred in granting summary judgment to Crosby on its breach of contract cause of action.

*B. Other Pediatricians*

Abdallah also argues that she was fraudulently induced to sign the contract in that Crosby represented that there was a strong need for a pediatrician in the area. According to Abdallah's deposition, when she first interviewed with Lowery she also met the only pediatrician in town, Dr. Tibitibiah. Lowery told her that he felt Picayune needed another pediatrician and that the area had been designated a health care professional shortage area. During her time in Picayune, however, Abdallah discovered that other physicians would potentially compete with her. Abdallah discovered that Crosby had already recruited two other family practitioners, Dr. Gipson and Dr. Denney. A third family practitioner, Dr.

28

Delores, was also practicing in the Picayune area.[8] Moreover, after she arrived, Crosby recruited Dr. Hussein, a pediatrician, and Dr. Weismann, a family practitioner, though these doctors began practicing in Picayune after Abdallah's contract with Crosby was broken. Abdallah argues that the family practitioners did some pediatrics and thus were in competition with her.

We conclude that Abdallah has not produced summary judgment evidence supporting her claim that these actions constituted fraudulent inducement. While Lowery asserted that there was a need for a pediatrician in the area, and the contract itself recites that, Abdallah has not provided any evidence that this assertion was knowingly false. It may very well be that Lowery thought that the family practitioners did not obviate the need for a second pediatrician; we cannot know, because Abdallah introduced no evidence on this point. The evidence does indicate that the hospital continued to recruit pediatricians and family practitioners, but this strongly indicates that Crosby believed that Picayune needed even more pediatric care professionals. Similarly, there was apparently nothing false in Lowery's claim that Picayune was designated as a health care professional shortage area. Abdallah has failed to introduce evidence supporting this element of her claim of fraudulent inducement.

Accordingly, we will affirm the grants of summary judgment on

---

[8] The evidence does not make clear whether Dr. Delores was recruited by Crosby.

these narrow grounds. Nevertheless, as discussed above the evidence of fraud in the green card issue compels us to reverse the district court's grant of summary judgment against Abdallah's counterclaim for fraudulent inducement and the grant of summary judgment on Crosby's claim for breach of contract.

## III. Breach of the Duty of Good Faith and Fair Dealing

Abdallah's challenge to Crosby's recruitment of other physicians is not limited to her fraudulent inducement claim. She also claims that their efforts to recruit other physicians diluted the market for a pediatrician in Picayune and thus breached the duty of good faith and fair dealing implicit in contracts.

Mississippi does indeed recognize an implicit duty of good faith in contracts. We also note that a party cannot violate the implicit duty of good faith by exercising a right made explicit in the contract. *See American Bankers' Ins. Co. of Fla. v. Wells*, 819 So. 2d 1196, 1206 (Miss. 2001); *McDonald's Corp. v. Watson*, 69 F.3d 36, 43 (5th Cir. 1995). The contract does not explicitly state that Crosby may continue to recruit physicians to the area, however, so we cannot rest solely on this basis.[9] Instead, we must

---

[9] Crosby claims Mississippi law holds that a party cannot breach the duty of good faith and fair dealing if it honors the terms of the agreement. This is a misreading of the relevant case law. The implicit duty of good faith cannot be breached by the exercise of a power affirmatively provided for (either by explicit statement or clear implication) in the contract, but Mississippi law does not support Crosby's claim that compliance with the terms of the contract nullifies the effect of extra-contractual actions taken in bad faith.

30

examine this situation to see if there is evidence of a breach of the duty of good faith. "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Wells*, 819 So.2d at 1206. Contrary to Crosby's suggestions, we find no case law stating further that the duty is breached only in "blatant, egregious circumstances."

Abdallah admits that she knew Crosby never promised it would not continue recruiting other physicians. To the contrary, she knew that she was taking a position in an area designated as having a severe shortage of health care professionals and thus could have easily predicted that other physicians would be recruited. Indeed, given this unfortunate state of affairs, the decent, fair and reasonable thing to do may have been to continue recruiting doctors. Additionally, we note that the doctors of which Abdallah complains did not begin practicing while the Net Income Guarantee Agreement was still in force. We find no evidence of indecent, unfair or unreasonable behavior and therefore affirm the district court's grant of summary judgment against Abdallah on her counterclaim for breach of the duty of good faith and fair dealing.

**IV. Tortious Interference With Contract and With Prospective Business Relations**

Abdallah also counterclaimed for tortious interference with contract and tortious interference with prospective business relations. Though she mentioned these counterclaims in her summary of argument, she failed to explain her contentions in the body of

31

her brief in this Court.  She has therefore waived these arguments on appeal.  *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001); FED. R. APP. P. 28(a)(9)(A).  Her arguments would have failed anyway.  A party to a contract cannot be held liable for tortious interference with that contract.  *See Cenac v. Murry*, 609 So. 2d 1258, 1269 (Miss. 1992).  Moreover, Abdallah has not shown that Crosby acted with the "malice" necessary for a tortious interference with prospective business relations claim.  *See MBF Corp. v. Century Business Communications, Inc.*, 663 So. 2d 595, 598 (Miss. 1995).  We therefore affirm the district court's award of summary judgment on the tortious interference claims.

## V.  The District Court's Choice to Strike the Legal Conclusions in The Expert's Affidavit

Abdallah's final contention on appeal is that the district court erred by striking portions of the affidavit of her expert, Paul A. Harris.  Though Crosby moved to completely strike the affidavit, the district court ultimately struck only the legal conclusions asserted by Harris.  We review this decision for abuse of discretion.  *See First United Financial Corp. v. U.S. Fidelity & Guar. Co.*, 96 F.3d 135, 137 (5th Cir. 1996).

Though Abdallah raises arguments based on the generally applicable Federal Rules of Evidence, we need only examine the specific effect of Federal Rule of Civil Procedure 56 governing summary judgments.  Wright, Miller and Kane opined that:

"Rule 56(e) further limits the matter to be properly included

32

in an affidavit to facts, and the facts introduced must be alleged on personal knowledge. Thus, ultimate or conclusory facts and conclusions of law, as well as statements made on belief or 'on information and belief,' cannot be utilized on a summary-judgment motion." WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 2738 (1998).

This circuit adopted Wright, Miller & Kane's reasoning in *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985), and reiterated the same point in *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220 (5th Cir. 1991). Harris's legal conclusions, therefore, were not valid summary judgment evidence. Because the court excluded only those portions of the affidavit that were useless at the summary judgment stage, the district court did not abuse its discretion. We affirm that ruling.

## Conclusion

We are persuaded that the only error in this case was the district court's choice to award summary judgment on the issue of Lowery's promise to help Abdallah obtain a green card. We reverse the summary judgment on her counterclaim for fraudulent inducement and remand for further proceedings. Because fraud is a defense to an action for breach of contract, we also reverse the grant of summary judgment on Crosby's suit against Abdallah and remand for further proceedings. The district court's order that Abdallah pay Crosby is also vacated for the same reason. We affirm all other aspects of the district court's summary judgment opinion, however. Finally, we find no error in the district court's striking of the

33

legal conclusions in the affidavit of Paul A. Harris.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART